UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

K.G.,

      Plaintiff,

v.

Shree Vishnu Hotel, LLC

      Defendant.

CIVIL ACTION FILE

NO.

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff files her Complaint and shows the Court as follows:

1.

K.G. is a victim of sex trafficking at the Masters Inn located at 1435 Montreal Road, Tucker, Georgia 30084. In 2015, K.G. was sold for sex at the hotel starting when she was a child of only 15. Given the nature of the case, Plaintiff is identified in this Complaint by her name. Plaintiff's counsel will disclose her full name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

---

[1] Contemporaneously with this Complaint, Plaintiff filed a Motion for Protective Order and Leave to Proceed Anonymously because the allegations in the Complaint, which include child sex trafficking, are intimate and personal in nature and raise concerns for Plaintiff's own personal safety.

2.

Defendant Shree Vishnu Hotel, LLC, is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Chugh CPA LLP, 8800 Roswell Road, Building C, Suite 230, Atlanta, Georgia 30350.

3.

Defendant Shree Vishnu Hotel, LLC has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to Defendant Shree Vishnu Hotel, LLC.

5.

Defendant knew or should have known that sex trafficking and prostitution were rampant at the hotel for years—before, during, and after Plaintiff's trafficking. Defendant knew because:

    a.  Defendant's employees knew about Plaintiff while she was sold for sex at the Masters Inn;

    b.  Defendant's employees knew of and permitted sex trafficking and prostitution to occur at the Masters Inn;

    c.  Defendant's employees knew about several other sex trafficking victims at the Masters Inn before, during, and after Plaintiff;

d.  Defendant knew or should have known about frequent and similar crimes occurring at the Masters Inn;

e.  Defendant knew about the reports by Masters Inn guests regarding sex trafficking and prostitution-related activities; and

f.  Defendant had knowledge of sex trafficking generally in the Atlanta area and at the Masters Inn specifically.

6.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Georgia law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under 18 U.S.C. § 1591(a)(1).

7.

Sex trafficking and prostitution were common at the Masters Inn and Defendant chose to ignore, allow, condone, facilitate, support, or permit occurrences of such activity at the hotel. Defendant is liable to Plaintiff for its actions and failure to act. Defendant's liability to Plaintiff is straightforward:

a. Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA and victimized Plaintiff. The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person **_knew or should have known_** has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). While operating the hotel, a common undertaking involving risk and potential profit, Defendant (i) rented a room to Plaintiff's trafficker so Plaintiff could be violently sold for sex at the hotel, and (ii) did so despite what it knew or should have known about Plaintiff being a victim of sex trafficking at the hotel. As a result of Defendant's conduct, Plaintiff suffered physical and mental harms, and Defendant is liable to Plaintiff for the damages arising from those harms under the TVPRA.

b. The Masters Inn maintained a public nuisance under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, including

minors, drugs, violence, and other dangerous illegal activity. As a direct result of this nuisance, Plaintiff was sold for sex at the Masters Inn, causing her substantial harm.

c. Because Plaintiff was a child when she was trafficked at the Masters Inn, Masha's Law, 18 U.S.C. § 2255, provides another avenue to pursue Plaintiff's civil remedy for the substantive violation of 17 U.S.C. § 1591, with the same substantive analysis as her § 1595 claim above.

8.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant at the Masters Inn.

**I.    K.G.'s trafficking at the Masters Inn.**

9.

In 2015, when she was only 15 years old, K.G. was illegally harbored, falsely imprisoned, and sold for child sex at the Masters Inn. K.G.'s traffickers took her to the Masters Inn because they knew it would be a good place to sell K.G. for sex.

5

10.

Upon check-in, hotel staff assigned K.G. a room on the second floor of the Masters Inn located behind a large column that obstructed the room from view. The location concealed its occupants, allowing the trafficking activity to occur with limited risk that it would be detected by law enforcement.

11.

While at the Masters Inn, K.G. was made to have sex with roughly 3 men. Defendant knew or should have known that the number of daily, older male visitors to the room was clearly indicative of child sex trafficking.

12.

In addition to being sold for sex to buyers, K.G.'s traffickers also forced her to have sex with them.

13.

K.G. was trafficked alongside another girl, and the two were kept in the same room.

14.

Over the course of 24 hours, approximately 18 to 20 men entered and exited K.G.'s room at the Masters Inn. This included 2 pimps, roughly 3 men whom K.G. was sold to for child sex, and approximately 10 to 15 men who came to purchase sex

from the other victim. Defendant knew or should have known that the frequent, older-male visitors to the room was clearly indicative of sex trafficking.

15.

While the other victim was seeing approximately 10 to 15 men per day, with each date lasting 15 to 30 minutes—totaling as many as 7 ½ hours of back-to-back visits—K.G. remained out of the room and on the hotel property. During this time, she spent hours in the common areas and walkways of the Masters Inn wearing nothing more than a tight-fitting tank top that barely covered her buttocks.

16.

Hotel staff had ample opportunity to observe K.G. during the times the other victim was being purchased for sex and, in fact, did observe her. While she was hanging out in the common areas of the Masters Inn, K.G. saw numerous staff members, including housekeepers and maintenance personnel. In turn, they observed her.

17.

At the beginning of the day, the other victim called the front desk to request additional towels and washcloths, and housekeeping delivered them to the room. The requests significantly exceeded the customary housekeeping needs of a regular hotel guest. These items were used to service the steady stream of men who came to the room to purchase sex. By providing the requested items, hotel staff knowingly supplied the things necessary for K.G. and the other victim to be sold for sex.

18.

Inside K.G.'s room, Defendant would have found trash cans filled with a dozen condoms, boxes of condoms, lube, and other paraphernalia indicating sex trafficking was occurring in the room.

19.

Illicit activity at the Masters Inn was pervasive. At least 15 other girls were at the hotel or in the parking lot being sold for sex. And at least half of those girls appeared to be as young as then-fifteen-year-old K.G.

20.

K.G. observed at least 5 men she understood to be pimps lingering outside rooms or sitting in vehicles in the parking lot. She saw girls approach these men and hand them money. These transactions were also visible to Defendant's employees and staff on the property.

21.

Once, K.G. observed a girl who was being sold for sex hand cash to a housekeeper in the common area of the hotel. The payment was made openly and was unrelated to any legitimate hotel charge. Upon information and belief, this was a payoff to hotel staff for keeping a lookout, turning a blind eye, or otherwise facilitating the illicit commercial sex at the Masters Inn.

22.

The widespread commercial sex activity at the Masters Inn attracted a significant number of buyers to the property. K.G. estimates that the Masters Inn accommodated no less than 100 buyers *each day*. Defendant knew or should have known that the number of daily male visitors to the hotel was clearly indicative of sex trafficking.

23.

Defendant knew or should have known that K.G. was being trafficked based on these signs and activities.

24.

Defendant had a policy not to call the police regarding known or suspected sex trafficking at the Masters Inn. Defendant followed this policy in the case of K.G. as well as other sex-trafficking victims because the hotel never once reported or encouraged others to report these activities at the property.

25.

On May 15, 2015, following an undercover operation by the Dekalb County Police Department Vice Unit, K.G. was rescued from room 205 at the Masters Inn.

26.

Defendant maintained a policy or practice of allowing and facilitating trafficking at the Masters Inn, including the trafficking of K.G. This policy was implemented, in part, by agreeing to house K.G.'s traffickers' ventures, associates, and victims, knowingly placing K.G. in a secluded and out-of-the-way area of the hotel, concealing her sex trafficking and protecting her traffickers from detection, permitting or failing to prevent employees to accept cash payments unrelated to any legitimate business purpose from individuals obviously engaged in commercial sex activity, and supplying the traffickers with the items they needed to sell K.G.

## II.    Defendant's knowledge of crime at the Masters Inn.

27.

The Masters Inn had a well-established reputation for criminal activity, including prostitution and sex trafficking.

28.

Before, during, and after Plaintiff's child sex trafficking at the Masters Inn, prostitution, sex trafficking, and child sex trafficking, were rampant, frequent occurrences at the hotel that were obvious to employees and guests.

29.

Defendant owned and operated the Masters Inn and employed the employees there, giving it specific and direct knowledge of prior and ongoing crime, including

prostitution and sex trafficking occurring at the hotel during and before its period of ownership and operation of the hotel, but not later than March 29, 2011.

30.

One victim, A.J., whose declaration is attached to this Complaint,[2] was also sex trafficked at Defendant's hotel on and off for several years beginning in 2013, when she was only 15 years old. A.J. described the Masters Inn as "a playground for the pimps and hoes."

31.

While at the Masters Inn, A.J. was sold for child sex to at least 10 men per day.

32.

A.J. purchased condoms and lubricants from a vending machine in the hotel's front office, in full view of employees who chatted with her during these transactions and plainly observed what she was buying.

33.

When too many buyers of sex were coming and going from A.J.'s room at the Masters Inn, Defendant's employees would call the room and move them to another area of the hotel.

---

[2] *See* Ex. 1, A.J. Declaration.

34.

Defendant's housekeeping staff cleaned A.J.'s room daily and observed signs of child sex trafficking, including used condoms in the trash and condoms, lubricant, wipes, and towels laid out on the dresser.

35.

Once, A.J. was in the room while another girl was meeting a buyer of sex. While the sexual encounter was ongoing, housekeeping staff entered the room to deliver towels and supplies to A.J.

36.

According to A.J., Defendant was fully aware of the sex trafficking and prostitution activity occurring at the hotel, which included young girls hanging around in skimpy clothing, men coming and going from the hotel at all hours, and pimps openly monitoring their girls.

37.

According to A.J., most of the guests staying at the hotel were selling sex, and many appeared to be children like A.J.

38.

A.J. estimates that more than 100 buyers of sex came and went from the Masters Inn each day during her stays.

39.

Another victim, G.W., whose declaration is attached to his Complaint,[3] was also trafficked at the Masters Inn off and on for years beginning in 2011, when she was only 14 years old.

40.

While staying at the Masters Inn, G.W. was purchased for child sex by multiple men per day, often back-to-back. When too many buyers of sex were coming and going from G.W.'s room, Defendant's employees would call the room and either tell her to stop seeing buyers or move her to another area of the hotel.

41.

Just like A.J., G.W. witnessed sex trafficking and prostitution occurring out in the open at the Masters Inn. She saw young girls standing around outside wearing very skimpy clothing, soliciting buyers of sex in the parking lot of the hotel, men coming and going from the hotel at all hours, and pimps openly monitoring their girls.

42.

Another victim, J.L., whose declaration is attached to this Complaint,[4] was trafficked for sex at the Masters Inn in early 2012. J.L. described the Masters Inn as

---

[3] *See* Ex. 2, G.W. Declaration.

[4] *See* Ex. 3, J.L. Declaration.

being "full of prostitution, pimps, and sex trafficking" and estimated that approximately half of the hotel was occupied by girls being sold for sex.

43.

While at the Masters Inn, J.L. had at least 10 men per day coming to the hotel to purchase her for sex.

44.

Staff intentionally placed J.L. and other girls being sold for sex in a secluded and less visible area of the hotel. And J.L. paid housekeepers to keep an eye out and not call the police.

45.

Another victim, C.B.D., whose declaration is attached to his Complaint,[5] was violently trafficked for sex at the Masters Inn in 2015 and 2016. C.B.D. was forced to see approximately 8 buyers of sex per day. Hotel staff intentionally placed C.B.D. and her trafficker in a room located in a quiet, out-of-the-way part of the hotel.

46.

On two separate occasions, C.B.D. went to the front desk and informed staff that she was being trafficked for sex. When she asked staff to help her or call the police, they told her it was not their job to help.

---

[5] *See* Ex. 4, C.B.D. Declaration.

14

47.

Malcolm Jones, whose declaration is attached to this Complaint,[6] stayed at the Masters Inn in 2017 while working construction nearby. During his stays, Jones observed three to five girls walking around the hotel and in the parking lot soliciting men to buy them for sex.

48.

Kameisha Ward, whose declaration is attached to this Complaint,[7] lived near the Masters Inn for more than a decade and resided at the hotel for approximately nine months beginning in 2021. During that time, she witnessed drugs, prostitution, and other criminal activity occurring openly and continuously on the property. Ms. Ward saw young girls dressed in revealing clothing go into hotel rooms with men who left shortly afterward.

49.

According to Ms. Ward, the hotel manager, Annie, lived on the property and was regularly present, yet did not intervene to stop the prostitution or other criminal activity. When Ms. Ward complained about men knocking on her door at all hours of the night looking for a woman who had previously been prostituted out of her room, management ignored her and threatened eviction if she continued to complain.

---

[6] *See* Ex. 5, Malcolm Jones Declaration.

[7] *See* Ex. 6, Kameisha Ward Declaration.

50.

Defendant provided a market and rooms for use by sex traffickers when sell-ing victims, including minors like K.G., to buyers of commercial sex. This is why Plaintiff's traffickers brought her to the Masters Inn to be sold for child sex.

51.

Seargent Hubert L. Brannon, Jr. ("Sgt. Brannon"),[8] a law enforcement officer with more than 30 years of experience and a former supervisor of the Dekalb County Vice Unit and FBI MATCH Task force operations supervised undercover investiga-tions at the Masters Inn.

52.

According to Sgt. Brannon, commercial sex activity at the Masters Inn was a common and recurring problem for law enforcement. Sgt. Brannon observed that the placement of the commercial sex activity in secluded areas of the Masters Inn was consistent with the practice and policies of hotels that are aware of commercial sex activity but attempt to keep it less visible.

53.

Women informed Sgt. Brannon that hotel staff warned or tipped off pimps when law enforcement were at or approaching the hotel.

---

[8] *See* Ex. 7, Seargent Hubert L. Brannon, Jr. Declaration.

54.

Based on his investigation, observations, training, and experience, Sgt. Brannon concluded that employees at the Masters Inn were warning pimps when police were present at the hotel.

55.

Lieutenant C.D. King ("Lt. King"),[9] is a law enforcement officer with over 18 years of experience, including service as the lead detective in the Dekalb County Vice Unit beginning in 2015, where he investigated drugs, prostitution, and sex trafficking in coordination with the FBI's MATCH Task Force.

56.

According to Lt. King, drug and commercial sex activity were common at the Masters Inn, and the hotel was a hotspot and "problem hotel" for drug and commercial sex crimes compared to other hotels in Dekalb County. The signs of prostitution and sex trafficking were common sense and apparent to staff, who did nothing to stop or prevent these sex crimes.

57.

Based on his observations, Lt. King estimates that as many as 20 women or girls were engaged in commercial sex at the Masters Inn at any given time.

---

[9] *See* Ex. 8, Lieutenant C.D. King Declaration.

58.

Defendant had actual or constructive knowledge of the Masters Inn's publicly available online reviews that reported prostitution and crime at the hotel from several years before, during, and for years after K.G. was sex-trafficked there, including the following (reproduced verbatim):

a. <u>May 2011, from TripAdvisor:</u>

Pimps, Drug dealers, Hookers! STAY FAR AWAY. Talk about a trashy hotel. Blood on the sheets, mold in the shower, they only ever gave us one towel, no shampoo, 3 girls hooking out of the room next to ours, drug deals on every corner. The main pimp for the hotel would always cruise up blasting the same song on his subs so all the girls would hear him come and they'd go downstairs to pay him. When we were checking out a Ford Explorer pulled up, a girl hopped out, the Explorer backed into a spot, and then she came back 20 secs later with a wad of cash and they left. One night my buddy had to go to the lobby and he had 2 people ask him if he "Had anything to sell". I stepped out of the room one night and had a hooker ask me "want to spend some time with me tonight". Not safe to leave the rooms after dark. There were cops at the hotel every night we were there. Another person we knew who was staying there had roaches in their room. They also have no restroom the "public" can use in the lobby. I got there a few mins prior to my buddy who was checking us in and I found that one out. Guess I should have known the hotel was crappy when we walked up and you couldnt even see the bottom of the pool where it was 3 1/2 feet deep.

b. <u>May 2011, from TripAdvisor:</u>

DO NOT STAY AT THIS HOTEL...........Pimps, Drug Dealers, Hookers !! The Room Was Nasty ........Not Safe.......They Put Us In A Drug Room...........Will Never Come To This Hotel Again......

Never Again.......Please Stay Away............This Is The Worst Hotel I Ever Been In..................

c. <u>September 2013, from TripAdvisor:</u>

This is the worst place I have ever seen. . . . [T]he carpets were stained and the hooker and john that checked in next to us had my child asking about the sounds coming from their room. Never again!!!!

d. <u>February 2014, from Yelp.com:</u>

It was the worst hotel experience ever!!!!!! Weird people walking around the parking lot all night. Extremely loud music in the room next door. . . .

e. <u>2014, from Google Reviews:</u>

Most of these reviews are lies the place is rampant with drugs and prostitutes. And the rooms are not cleaned if you complain the( Ms patel) stalks you. very unsafe. this is just a warning

f. <u>2015, from Google Reviews:</u>

STAY AWAY, DO NOT TRAVEL HERE UNLESS YOU ARE DRUGGING OR INTERESTED IN REALLY TRASHY HOOK-ERS!!!! You can't go outside of your room without someone trying to sell you ONE OR THE OTHER! Also it Seems as if the so called mgt there is working with them. Because anytime you TRY to complain, "Big DIP$#*+" Anne, who is only the housekeeping mgr, REALLY does thinks she's the boss, and will actually shrew you away! We stayed here for over a month due to our own per-sonal mistake! Today, We wouldn't send even our worst enemy here! THEY, are too good for this CRACK PIPE SMOKING, HOOD-RAT HOOKER MOTEL!!!!

g. <u>2015, from Google Reviews:</u>

Do not let the pineapple in the logo fool you, the Masters Inn is a terrible place and I can only imagine that the 5 star reviews for this

19

Inn are in fact false. I arrived to the hotel in the middle of a police raid with prostitutes running around and pimps standing their ground against the police. I made the poor decision to look at the room I had just paid for only to find that the room, already disgusting with a foul smell, had just been "used" and not cleaned before my arrival. I immediately ran to the lobby to get a refund within the 15 minute window (a rule they instated for obvious reasons). The hotel manager argued with me before giving a refund and I left as fast as I could.

h.  2015, from Google Reviews:

This place was horrible! . . . It is right next to highway 285 constant noise all night long and the place is filled with prostitutes and drug addicts stay away!

i.  2016, from Google Reviews:

NEVER STAY AT THIS PLACE, EVER. Its filthy, dirty, and filled with beg bugs, roaches, and other bugs. Plus there a lot of crime. A LOT.

j.  2016, from Google Reviews:

Terrible! I cant even go to the vending machine without being hassled for money, sex, or drugs. . . . this hotel is a nightmare.

k.  2016, from Google Reviews:

. . . NEVER STAY HERE!!!!!!! I even witnessed the front desk agent let a girl who was clearly a prostitute check in with no ID! This place is trash! But they do have free WiFi lol. So I guess they figure they can do what they want. TRASH! Also I can damn near promise you that all of these good reviews are from prostitutes and there pimps. Smh shady ass place.

l.  February 2016, from Yelp:

. . . [T]he illegal activity makes you fear for your safety and the type of people that stay here seem to all be looking for long term

stay or they are all sketchy homeless so some have multiple people in their room and they look and behave strange.

m. <u>February 2016, from Yelp:</u>

. . . The owner is very greedy and allows illegal activities to take place. It was nothing to see pimps and prostitutes! I believe for an extra fee he lets this take place because all the housekeepers knew this guy by name, and talked to him like an employee while he rented his room out for these activities! . . .

n. <u>September 2016, from Yelp:</u>

I have never had such a horrendous experience in my life. First, the desk staff was extremely rude to us, like we were bothering her to be there, then when we finally got up to out room, we noticed some strange insects that we encountered while sitting on the bed, so I pull the sheets away from the mattress to investigate, and other found something even more disturbing... blood stains, like a lot of them. More than something like a feminine accident or something like that, it was a lot of blood. So I go to the desk to complain, and try and get a refund, the Indian guy at the desk refused, and called the cops on us for demanding a refund. Also I'm pretty sure they arrested a prostitute from a neighboring room. "Masters inn"? More like" murder Inn".

o. <u>2017, from Google Reviews:</u>

We stopped by to rent 2 rooms for our family after driving hours and looking for a hotel. Upon sitting down in the bed and pulling back the bedspread, there laid a crack pipe. Yes, you read that correctly. A crack pipe. That was disturbing enough, but to think that 1 of 2 things had happened. Either they didn't change the sheets or the cleaning people left it there. Don't know which. Needless to say, I was not going to let my children sleep where laid a crack pipe so we left. Lots of questionable activity around the hotel. People coming and going continuously. Nonsmoking rooms smell like smoke. The only good thing I can say was the receptionist was nice. Don't even stop here. You will have to pay over $100 to find a decent hotel in this area. But better safe than sorry.

p. <u>September 2017, from TripAdvisor:</u>

. . . [T]here was people going from floor to floor. I do not know
what they where looking for. The neighborhood is extremely bad.
Do not waste your time. The rooms are not even worth a dollar a
night.

q. <u>2018, from Google Reviews:</u>

Horrible. Hookers. Drug dealers and roaches load and dirty

r. <u>January 2018, from Kayak:</u>

Rooms smelled, staff refused to correct problem until a manager
was requested, no smoke alarms operational. Hookers roaming ho-
tel would never recommend at all.

s. <u>2019, from Google Reviews:</u>

Further more, every night was very noisy, some weird creepy guy
walks around all day and night watching and following people. . . .
Also this place breaks many hotel and hospitality violations. Do
not stay here and be taken advantage again. This place will never
receive my business again nor would I recommend it to anyone! I
will contact the better business bureau on this matter.

t. <u>2019, from Google Reviews:</u>

. . . a women did get beat up outside my room by some guy police
never showed up she just took an L

u. <u>2020, from Google Reviews:</u>

Super sketchy place. . . . When we tried getting an uber, they
wouldn't in to the hotel parking lot. We could see them driving up
to the property way out of reach from the hotel and we tried com-
municating with them to come closer but they wouldn't respond
and we would just receive a notification letting us k iw they were
sending a different driver. We booked an uber THREE TIMES!!
Before the 4th one actually showed up and that uber driver told us

that we were in a "rough" part of town and were afraid to come into that hotel property.

v. <u>February 2020, from Kayak:</u>

. . . I checked IN with multiple rooms open but the staff member put me DIRECTLY beside a couple that fought and had domestic issues. Police were called and got NO rest. Very unaccomodating.

w. <u>2021, from Google Reviews:</u>

Not enough towels, shoes and drug paraphernalia was left there by last renter, check in staff was extremely rude, and alot of traffic in front of the room I was renting. Also TV only had 9 working channels.

x. <u>April 2022, from Kayak:</u>

Many people loitering around. A man asked me why I was traveling alone? How would he know that? Was he watching me? 2 men screaming and yelling at each other in parking lot. Did not feel safe there. Was charged additional $81 after prepaying online. Why?

y. <u>March 2023, from Kayak:</u>

. . . People standing in the stairway with skimask on like they were getting ready to rob u

z. <u>2024, from Google Reviews:</u>

. . . On the drive up to the hotel lobby, I seen one naked woman open the door for a man then another naked woman covered with only a sheet, hopping inside a vehicle. Why didn't I turn my car around at this point? The lord only knows. . . . Whatever you do, please do not spend a dime here. You've been warned!

aa. <u>2024, from Google Reviews:</u>

. . . [A]bout an hour into our stay we heard several extremely loud gun shots which sounded like it happened right next to our room. I

have never had something that scary happen so we were ready to dip! . . .

bb. <u>June 2024, from Priceline:</u>

Prostitution and drugs bad all the time cops cops" - Police police police people kicking doors screaming kids running around at night time when she be in it's drug infested

cc. <u>January 2025, from TripAdvisor:</u>

This was the worst experience I have ever had staying in a motel. . . . The whole vibe was creepy - throughout the property. A damaged car with blacked out windows followed me slowly around as I searched for a place near my room to park. . . . I do not exaggerate. I do not bother to leave reviews normally. But this place was beyond belief.

dd. <u>March 2025, from Booking.com:</u>

. . . area is gloomy, and check-in is done through a drawer and speaker with a receptionist. Seems like a crime-ridden area all around. . . .

ee. <u>April 2025, from Expedia:</u>

Go elsewhere. The area was shady at best. Had a strange man follow me and try to keep talking to me at checlin until he found out i was with my father then he disappeared. Went to the convenient store next door and had a man rush out the store behind me until i got to my car and he saw my father inside waiting for me then he turned around real fast. . . .

ff. <u>June 2025, from Priceline:</u>

Fine, but maybe you can try to find something better. And check the location, according to chat GPT, sex offender was [a]t," . . .

59.

Defendant knew or should have known of these and other customer reports about the nuisance created by dangerous, criminal activity that occurred on the Masters Inn.

60.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the Masters Inn and criminal activity that is commonly known to accompany sexual crimes like prostitution and sex trafficking. Much of this activity either alerted or should have alerted Defendant to the hotel's rampant sex trafficking, prostitution, and sex crime problem. As inexhaustive examples, the police responded to the following incidents at the hotel over the previous 15 years:

a.  On July 15, 2011, a victim reported being **sexually assaulted** at the Masters Inn.

b.  On September 16, 2011, the Dekalb County Vice Unit conducted a prostitution sting at the Masters Inn and arrested a female for **prostitution**.

c.  On September 29, 2011, a woman reported that her boyfriend physically assaulted her in the parking lot of the Masters Inn by punching her with a closed fist multiple times in the face.

25

d.  On March 14, 2012, the Dekalb County Vice Unit conducted a prostitution sting at the Masters Inn in conjunction with the Internet Crimes Against Children Unit and arrested a female for **prostitution**.

e.  On March 22, 2012, the Dekalb County Vice Unit conducted a police operation targeting prostitutes at the Masters Inn and arrested a female for **prostitution** and another individual for **pimping** and **keeping a place of prostitution**.

f.  On June 15, 2013, a woman reported that a man placed her in a headlock in the parking lot of the Masters Inn and attempted to pull her back into a room.

g.  On June 23, 2013, another woman reported that she was physically assaulted by her boyfriend at the Masters Inn.

h.  On August 8, 2013, the Dekalb County Vice Unit conducted a police operation targeting prostitutes at the Masters Inn and arrested three females for **prostitution**.

i.  On January 30, 2014, the Dekalb County Vice Unit conduced an undercover operation at the Masters Inn and arrested a female for **prostitution**.

j.   On January 19, 2015, a woman stabbed her boyfriend in the throat after he entered her room while she was sleeping, climbed on top of her, and began choking her.

k. On January 27, 2015, a victim reported being held against her will at the Masters Inn after her assailant choked her, prevented her from leaving the room, and threatened to harm her if she attempted to seek help.

l.  On March 2, 2015, multiple bullet holes were discovered in the walls and ceiling of rooms 230 and 231 at the Masters Inn. A full metal jacket handgun round was found lodged in the wall above the television.

m. On March 26, 2015, the Dekalb County Vice Unit conducted a prostitution sting at the Masters Inn, and a female was arrested for **prostitution**.

n. On May 15, 2015, the Dekalb County Vice Unit conducted a prostitution sting at the Masters Inn. During this operation, a juvenile was rescued and a second individual was charged with **human trafficking, pimping, keeping a place of prostitution,** and **prostitution**.

o. On August 11, 2015, a woman reported getting into a physical altercation with a male at the Masters Inn, during which he struck her in the face.

p. On August 25, 2015, the Dekalb County Vice Unit conducted an undercover operation at the Masters Inn and arrested a female for **prostitution** and a male for **keeping a place of prostitution**.

q.  On October 13, 2015, a woman reported that after meeting a man and renting a room at the Masters Inn, a dispute arose over money. During the argument, the man allegedly threatened to retrieve a gun and shoot her.

r.  On April 8, 2016, a woman reported getting into a physical altercation with a male, during which the man pushed the woman and grabbed her arms with both of his hands.

s.  On April 28, 2016, the Dekalb County Vice Unit conducted a prostitution operation at the Masters Inn and arrested a female for **prostitution**.

t.  On May 24, 2016, an individual reported being raped and assaulted at the Masters Inn.

u.  On June 23, 2016, officers observed a man at the Masters Inn aggressively banging on the door of room 112 and yelling at the occupant inside. The man was taken into custody and cited for disorderly conduct.

v.  On June 29, 2016, the Dekalb County Vice Unit conducted a prostitution operation at the Masters Inn and arrested a female for **prostitution and keeping a place of prostitution**.

w.  On October 6, 2016, a woman reported that she was assaulted by a man at the Masters Inn, who grabbed her, threw her to the ground, kicked her, and took her phone in the hotel parking lot.

x.  On February 11, 2017, officers responded to room 110 of the Masters Inn regarding a report for a possible sexual assault and found a housekeeper actively cleaning the room. The officers immediately ordered her to stop. The employee advised that she had already bagged several items and removed bedding from the room before being stopped.

y.  On July 20, 2017, the Dekalb County Vice Unit and the Federal Bureau of Investigations Metro Atlanta Child Exploitation Task Force (MATCH) conducted an operation in connection with child and adult prostitution at the Masters Inn. During this operation, a female was charged with **prostitution** and a male was charged with **pimping**.

z.  On December 25, 2017, a female reported she got in a verbal and physical altercation with her boyfriend, who struck her in the face at the Masters Inn.

aa. On January 21, 2018, Masters Inn staff found a Mossberg 500A 12-guage shotgun with what appeared to be a sawed-off barrel and taped pistol grip left behind in room 201. A records check confirmed the shotgun had been reported stolen.

bb. On March 20, 2018, a victim reported being **raped** at the Masters Inn.

cc. On April 25, 2018, Dekalb County Vice Unit conducted a prostitution operation at the Masters Inn and arrested a female for **prostitution**.

29

dd. On September 25, 2018, a woman reported that she was assaulted by her ex-boyfriend at the Masters Inn, who struck the victim with a closed fist.

ee. On December 20, 2018, a woman reported that she was assaulted by her ex-boyfriend at the Masters Inn, who struck the victim in the face with a closed fist.

ff. On April 20, 2019, a woman reported that she was assaulted by her boyfriend at the Masters Inn.

gg. On March 23, 2020, a woman reported that she was assaulted by her boyfriend at the Masters Inn, who slapped the victim in the face, head butted her nose and attempted to drag her out of their hotel room.

hh. On May 5, 2020, a woman reported that she was assaulted by her boyfriend at the Masters Inn, who attacked her in the parking lot of the Masters Inn.

ii. On November 19, 2020, a woman reported that a man exposed himself to her and masturbated while watching the woman at the Masters Inn.

jj. On January 4, 2021, a woman reported that her ex-boyfriend assaulted her at the Masters Inn. The victim reported that the assailant struck her repeatedly with a plastic blind rod and bit her on the face.

kk. On January 30, 2021, a woman reported being sexually assaulted at the Masters Inn.

ll.  On April 6, 2021, a man reported that he went to the Masters Inn to meet a woman he had met online but left after realizing she did not match her online profile. While walking through the parking lot, he was confronted by a man who exited a nearby room and argued with him about the woman. The man then struck the victim in the jaw with a handgun.

mm.  On April 19, 2021, a woman was shot outside room 318 at the Masters Inn.

nn. On March 16, 2023, the Dekalb County Vice Unit and the Tucker NET Team conducted a prostitution sting at the Masters Inn. During this operation, one individual was charged with **prostitution** and **keeping a place of prostitution**.

oo.  On June 14, 2024, a woman reported that she was assaulted by a man at the Masters Inn, who snatched her phone, placed his hands around her neck and lost consciousness, struck her in the face with a handgun before punching her in the face with a closed fist.

pp.  On July 24, 2024, a shootout occurred at the Masters Inn after a woman reported being harassed by several individuals, prompting her boyfriend to confront them, which escalated into gunfire.

61.

Defendant knew or should have known of these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

62.

Defendant and its employees knew or should have known that obvious sex trafficking, including KG's sex trafficking, was occurring at their property, at times with the assistance of its employees.

63.

Despite the dangerous, illegal, and criminal activity surrounding the property, Defendant and the hotel negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

64.

Despite having actual or constructive knowledge of this illegal activity, Defendant negligently failed to take reasonable steps to stop such illegal and dangerous activities from occurring, including that involving its own employees.

65.

Additionally, Defendant negligently failed to provide proper training to its employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the hotel.

66.

Defendant also negligently failed to supervise its employees to ensure the hotel was not facilitating sex trafficking and participating in sex trafficking through the business of the hotel, as was the case with KG's trafficking.

67.

Defendant also negligently failed to train its staff in a reasonable and uniform manner, including, among other things, how staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so the hotel could better deter or prevent crime in the future.

68.

Defendant also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

69.

Defendant knew or should have known that they were permitting the hotel to be used as a place of prostitution and sex trafficking.

### III.    Defendant knowledge of sex trafficking generally.

70.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking

33

and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

71.

Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Masters Inn. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000.[10] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant benefited from some of those illicit profits by rental rates paid for the hotel rooms used for the trafficking of Plaintiff.

---

[10] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable,* Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Feb. 20, 2026); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30-32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Feb. 20, 2026).

72.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[11] and as "the number one city for child sex trafficking."[12]

73.

Defendant knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

74.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving motels and hotels were sex trafficking cases, and

---

[11] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Feb. 20, 2026).

[12] *Id.*

another 2.6 percent reported a combination of sex and labor trafficking.[13] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[14] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[15] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[16]

75.

Defendant knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[17] and that the industry had been

---

[13] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://respect.international/wp-content/uploads/2020/11/National-Hotline-Cases-Occurring-in-Hotels-and-Motels-.pdf (last visited Feb. 20, 2026).

[14] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https.www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

[15] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf  (last visited Feb. 20, 2026).

[16] *Id.* at 23.

[17] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), https://perma.cc/X5DG-YQ3M.

warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[18]

76.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[19]

77.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

    a.  establish corporate policy and procedures against sexual exploitation of children;

    b.  train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

    c.  include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

---

[18] *Id.* at 19.

[19] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Feb. 20, 2026).

Case 1:26-cv-01007-TWT    Document 1    Filed 02/20/26    Page 38 of 52

d. provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e. support, collaborate, and engage stakeholders in the prevention of sexual exploitation of children; and

f. report annually on the company's implementation of Code-related activities.

78.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking.

79.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct house-keeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

b. persons who lack freedom of movement or are constantly moni-tored;

c.  persons who have no control over or possession of money or ID;

d.  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

f.  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.  extended stay with few or no personal possessions in the room;

h.  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.  the same person reserves multiple rooms;

j.  a room is rented hourly, less than a day, or for an atypical extended stay;

k.  attempts to sell items to or beg from patrons or staff;

l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

m.  loitering and solicitation of male patrons;

n.  waiting at a table or bar and picked up by a male (trafficker or customer);

o.  persons asking staff or patrons for food or money; and

p.  persons taking cash or receipts left on tables.

80.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and peddle sex—sex trafficking would cease to exist. In Plaintiff's case, the Masters Inn, for a fee, provided this market for Plaintiff to be confined and sold.

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

81.

Plaintiff incorporates the foregoing and following allegations as if fully restated herein.

82.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendant knowingly benefitted from participation in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

83.

Defendant knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Masters Inn, including the revenue generated for the room in which Plaintiff was trafficked. Each day Plaintiff was trafficked

at the Masters Inn, Defendant knowingly benefited by receiving money from Plaintiff's trafficking in the form of room-rental fees.

84.

Defendant's operation of the Masters Inn constituted a venture.

85.

Defendant participated in its hotel venture and knew or should have known that its operation of the hotel violated the TVPRA by harboring and falsely imprisoning Plaintiff so that Plaintiff could be sold for sex as a minor at the Masters Inn.

86.

Defendant also participated in a venture involving Plaintiff's sex trafficker. The rental of rooms for profit to Plaintiff's sex trafficker, rooms in which Plaintiff and others were sold for sex to generate revenue for Defendants, also constituted a venture under the TVPRA.

87.

The ventures in which Defendant participated were in or affecting interstate commerce.

88.

Defendant's harboring Plaintiff as part of her sex trafficking constituted false imprisonment. At times, Plaintiff's false imprisonment at the Masters Inn was

independent of any other aspect of her trafficking, such as sexual encounters, assaults, or batteries she may have endured.

89.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives participated in Plaintiff's child sex trafficking at the Masters Inn. Defendant knew or should have known of this participation.

90.

Defendant also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Masters Inn.

91.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

92.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

93.

Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

94.

Thus, as described herein, Defendant is jointly and severally liable to Plaintiff for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused by the acts alleged herein.

## COUNT II
## NUISANCE

95.

Plaintiff incorporates the foregoing and following allegations as if fully restated herein.

96.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

97.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

98.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

99.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

100.

The Masters Inn's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

101.

The Masters Inn caused or contributed to a blighting effect on the surrounding community, so that the Masters Inn negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Masters Inn, although the effects on each person may have varied.

102.

The illegal prostitution and sex trafficking nuisance occurring at the Masters Inn had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

103.

The acts and omissions of Defendant in permitting prostitution and sex trafficking at the Masters Inn caused special damages to Plaintiff, as she was the victim of child sex trafficking at Defendant's nuisance hotel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiff for all such damages.

## Public Nuisance Per Se

### 104.

The Masters Inn constituted a statutory nuisance per se under Georgia law because Defendant knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the Masters Inn including sex trafficking.

### 105.

A business where illegal practices are permitted constitutes a nuisance.

### 106.

A business, like the Masters Inn, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

### 107.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Masters Inn that permitted illegal sexual activity to occur there.

### 108.

Defendant is liable for nuisance (public nuisance and/or per se public nuisance) by reason of its failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendant has express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## COUNT III
## STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255

### 109.

Plaintiff incorporates the foregoing and following allegations as if fully set forth herein.

### 110.

Plaintiff was under the age of 18 when she was trafficked at the Masters Inn.

### 111.

Plaintiff was a victim of violations of 18 U.S.C. § 1591 at the Masters Inn.

### 112.

As described herein and specifically in paragraphs 79–94, Defendant knowingly benefitting from participating in a venture that it knew or should have known engaged in an act of sex trafficking at the Masters Inn, including the harboring and other trafficking activities which harmed Plaintiff.

### 113.

Plaintiff suffered personal injury as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

### 114.

Thus, as described herein, Defendant is jointly and severally liable to Plaintiff for compensatory and punitive damages, in an amount to be determined at trial.

**DAMAGES**

115.

Plaintiff incorporates the paragraphs above as if fully restated herein.

116.

As a proximate and foreseeable result of Defendant's violations of the TVPRA and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

    a.  Personal injuries;

    b.  Past, present and future conscious pain and suffering;

    c.  Loss of enjoyment of life;

    d.  Mental anguish and emotional distress;

    e.  Incidental expenses;

    f.  All special, compensatory, economic, punitive, and other damages

       permissible under Georgia and federal law; and

    g.  Consequential damages to be proven at trial.

117.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendant and its employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

118.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendant for the following:

    a.  Process issue as provided by law;

49

b. Plaintiff be awarded actual damages in amounts to be shown at trial from Defendant;

c. Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

d. Plaintiff be awarded a trial by jury; and

e. Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on February 20, 2026.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
STEPHEN D. MORRISON, III
Georgia Bar No. 700828
smorrison@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
STEPHEN D. MORRISON, III
Georgia Bar No. 700828
smorrison@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile