# Exhibit A

# (Proposed) First Amended Complaint

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| K.G. *and* G.W.,<br><br>Plaintiffs,<br><br>v.<br><br>SHREE VISHNU HOTEL, LLC, *and* TRINITY SNK CORPORATION F/K/A GLOBAL MANAGEMENT & INVESTMENT CORPORATION,<br><br>Defendants. | No. 1:26-cv-01007-TWT<br><br>**JURY TRIAL DEMANDED** |

[PROPOSED] **FIRST AMENDED COMPLAINT**

Plaintiffs K.G. and G.W. file their First Amended Complaint, showing the Court as follows:

1.

K.G. is a victim of sex trafficking at the Masters Inn located at 1435 Montreal Road, Tucker, Georgia 30084. In 2015, K.G. was sold for sex at the hotel starting when she was a child of only 15. Given the nature of the case, K.G. is identified in

this complaint by pseudonym. Plaintiffs' counsel has disclosed K.G.'s full name to defense counsel pursuant to this Court's protective order.[1]

2.

G.W. is a victim of sex trafficking at the Masters Inn located at 1435 Montreal Road, Tucker, Georgia 30084. Beginning no later than 2011 when she was a child of around 13 years old, and through at least November 2016, Plaintiff was sold for sex at the Masters Inn. Given the nature of the case, G.W. is identified in this complaint by pseudonym. Plaintiffs' counsel has disclosed G.W.'s full name to defense counsel pursuant to this Court's protective order.

3.

Defendant Shree Vishnu Hotel, LLC, is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service has been made on said Defendant by serving its Registered Agent: Chugh CPA LLP, 8800 Roswell Road, Building C, Suite 230, Atlanta, Georgia 30350. Service may be further made by service pursuant to applicable rules upon its counsel of record in this case.

---

[1] The Court entered a Protective Order, which applies to both Plaintiffs in this case and allows them to proceed pseudonymously. *See* Doc. 7. Plaintiffs also have provided or will confidentially provide their dates of birth to Defendants.

4.

Defendant Trinity SNK Corporation f/k/a Global Management & Investment Corporation is a Georgia corporation authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on Defendant Trinity SNK Corporation upon its Registered Agent: Joel M. Haber, 2030 Avalon Parkway, Suite 200, McDonough, Georgia 30253.

5.

Upon information and belief, Defendant Trinity SNK Corporation was at all times relevant to this lawsuit as a member of and/or owner of Defendant Shree Vishnu Hotel, LLC. Further and/or in the alternative, persons who owned, operated, controlled, or managed Trinity SNK Corporation overlapped with and included persons who owned, were members of, operated, controlled, or managed Defendant Shree Vishnu Hotel, LLC, and the Masters Inn.

6.

Defendant Shree Vishnu Hotel, LLC, owned, controlled, managed, and/or operated the Masters Inn during all times relevant to this lawsuit.

7.

Defendant Trinity SNK Corporation owned, controlled, managed, and/or operated the Masters Inn during all times relevant to this lawsuit.

8.

Defendant Shree Vishnu Hotel, LLC, has been properly served with process in this action.

9.

Defendant Trinity SNK Corporation has been properly served with process in this action.

10.

Jurisdiction and venue are proper as to Defendants.

11.

Defendants knew or should have known that sex trafficking and prostitution were rampant at the hotel for years—before, during, and after Plaintiffs' trafficking. Defendants knew because:

a. Defendants' employees knew about Plaintiffs while they were sold for sex at the Masters Inn;

b. Defendants' employees knew of and permitted sex trafficking and prostitution to occur at the Masters Inn;

c. Defendants' employees knew about several other sex trafficking victims at the Masters Inn before, during, and after Plaintiffs were sold there for child sex;

d. Defendants knew or should have known about frequent and similar and/or related crimes occurring at the Masters Inn;

e. Defendants knew about the reports by Masters Inn guests regarding sex trafficking and prostitution-related activities; and

f. Defendants had knowledge of sex trafficking generally in the Atlanta area and at the Masters Inn specifically.

12.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Georgia law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under 18 U.S.C. § 1591(a)(1).

13.

Sex trafficking and prostitution were common at the Masters Inn and Defendants chose to benefit from, ignore, allow, condone, facilitate, support, or permit occurrences of such activity at the hotel. Defendants are liable to Plaintiffs for their actions and failure to act. Defendants' liability to Plaintiffs is straightforward:

a. Defendants knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA and victimized Plaintiffs. The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person ***knew or should have known*** has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). While operating the hotel, a common undertaking involving risk and potential profit, Defendants (i) rented a room to Plaintiffs' traffickers so Plaintiffs could be violently sold for sex at the hotel, and (ii) did so despite what Defendants knew or should have known about Plaintiffs being victims of sex trafficking at the hotel. As a result of Defendants' conduct, Plaintiffs suffered physical and mental harms, and Defendants are liable to Plaintiffs for the damages arising from those harms under the TVPRA.

b. The Masters Inn maintained a public nuisance under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, including

minors, drugs, violence, and other dangerous illegal activity. As a direct result of this nuisance, Plaintiffs were sold for sex at the Masters Inn, causing them substantial harm.

c. Because Plaintiffs were children when they were trafficked at the Masters Inn, Masha's Law, 18 U.S.C. § 2255, provides another avenue to pursue Plaintiffs' civil remedy for the substantive violation of 18 U.S.C. § 1591, with the same substantive analysis as their § 1595 claim above.

14.

The Masters Inn is a trade name of the subject hotel in this lawsuit. It lacks any independent existence and its acts or omissions are only those of Defendants, their staff, employees, or other agents. Such persons or entities are the means by which Defendants owned, operated, controlled, or managed the Masters Inn as alleged herein.

15.

Defendant Shree Vishnu Hotel, by and through its employees or other persons acting on its behalf or in its interest, acted as agents of Defendant Trinity SNK Corporation with respect to the operation of the Masters Inn. Defendant Trinity SNK Corporation controlled, financed, resourced, supported, approved, ratified, or otherwise contributed to and participated in the operation of Shree Vishnu Hotel, LLC,

generally, and specifically for the purpose of ensuring the ongoing operations of the Masters Inn.

16.

Defendants created, implemented, and enforced policies, practices, and procedures in participation with, which facilitated, and which enabled the rampant illegal activity at the Masters Inn as alleged herein, including Plaintiffs' sex trafficking. Whenever any allegation refers to the acts or omissions of the Masters Inn and/or its staff, such allegations are that Defendants acted insofar as they owned, directed, managed, controlled, approved, or ratified the acts or omissions by the Masters Inn and its staff.

17.

Upon information and belief, Trinity SNK Corporation hired, controlled, directed, compensated, approved, or ratified the acts or omissions of Defendant Shree Vishnu Hotel, LLC, and Masters Inn staff, including individuals employed, hired, or controlled by Defendant Shree Vishnu Hotel. At all relevant times, Masters Inn staff and/or Defendant Shree Vishnu Hotel were acting within the course and scope of an agency relationship with Defendants and for the benefit of such Defendants.

18.

Whenever reference is made in this Complaint to any act, deed, or conduct of any Defendant or Defendants collectively, the allegation is that each Defendant

engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the ownership, management, direction, control, or transaction of the ordinary business and affairs of Defendants with respect to the Masters Inn.[2]

**I. Plaintiff K.G.'s trafficking at the Masters Inn.**

19.

In 2015, when she was only 15 years old, K.G. was illegally harbored, falsely imprisoned, and sold for child sex at the Masters Inn. K.G.'s traffickers took her to the Masters Inn because they knew it would be a good place to sell K.G. for sex.

20.

Upon check-in, hotel staff assigned K.G. a room on the second floor of the Masters Inn located behind a large column that obstructed the room from view. The location concealed its occupants, allowing the trafficking activity to occur with limited risk that it would be detected by law enforcement.

---

[2] To avoid unnecessarily increasing the length of this complaint, any time the term "Defendants" appears or a specific Defendant is named, the complaint should be read as if the allegation is made as to each Defendant and, in the alternative, to Defendants collectively as a single enterprise operating in concert.

21.

While at the Masters Inn, K.G. was made to have sex with roughly 3 men. Defendants knew or should have known that the number of daily, older male visitors to the room was clearly indicative of child sex trafficking.

22.

In addition to being sold for sex to buyers, K.G.'s traffickers also forced her to have sex with them.

23.

K.G. was trafficked alongside another girl, and the two were kept in the same room.

24.

Over the course of 24 hours, approximately 18 to 20 men entered and exited K.G.'s room at the Masters Inn. This included 2 pimps, roughly 3 men whom K.G. was sold to for child sex, and approximately 10 to 15 men who came to purchase sex from the other victim. Defendants knew or should have known that the frequent, older-male visitors to the room were clearly indicative of sex trafficking.

25.

While the other victim was seeing approximately 10 to 15 men per day, with each date lasting 15 to 30 minutes—totaling as many as 7 ½ hours of back-to-back visits—K.G. remained out of the room and on the hotel property. During this time,

she spent hours in the common areas and walkways of the Masters Inn wearing nothing more than a tight-fitting tank top that barely covered her buttocks.

26.

Hotel staff had ample opportunity to observe K.G. during the times the other victim was being purchased for sex and, in fact, did observe her. While she was hanging out in the common areas of the Masters Inn, K.G. saw numerous staff members, including housekeepers and maintenance personnel. In turn, they observed her.

27.

At the beginning of the day, the other victim called the front desk to request additional towels and washcloths, and housekeeping delivered them to the room. The requests significantly exceeded the customary housekeeping needs of a regular hotel guest. These items were used to service the steady stream of men who came to the room to purchase sex. By providing the requested items, hotel staff knowingly supplied the things necessary for K.G. and the other victim to be sold for sex.

28.

Inside K.G.'s room, Defendants would have found trash cans filled with a dozen condoms, boxes of unused condoms, lube, and other paraphernalia indicating sex trafficking was occurring in the room.

29.

Illicit activity at the Masters Inn was pervasive. At least 15 other girls were at the hotel or in the parking lot being sold for sex. And at least half of those girls appeared to be as young as then-fifteen-year-old K.G.

30.

K.G. observed at least 5 men she understood to be pimps lingering outside rooms or sitting in vehicles in the parking lot. She saw girls approach these men and hand them money. These transactions were also visible to Defendants' employees and staff on the property.

31.

Once, K.G. observed a girl who was being sold for sex hand cash to a housekeeper in the common area of the hotel. The payment was made openly and was unrelated to any legitimate hotel charge. Upon information and belief, this was a payoff to hotel staff for keeping a lookout, turning a blind eye, or otherwise facilitating the illicit commercial sex at the Masters Inn.

32.

The widespread commercial sex activity at the Masters Inn attracted a significant number of buyers to the property. K.G. estimates that the Masters Inn accommodated no less than 100 buyers each day. Defendants knew or should have known

that the number of daily male visitors to the hotel was clearly indicative of sex trafficking.

33.

Defendants knew or should have known that K.G. was being trafficked based on these signs and activities.

34.

Defendants had a policy not to call the police regarding known or suspected sex trafficking at the Masters Inn. Defendants implemented or otherwise followed this policy in the case of K.G. as well as other sex-trafficking victims because the hotel never once reported or encouraged others to report these activities at the property.

35.

On May 15, 2015, following an undercover operation by the DeKalb County Police Department Vice Unit, K.G. was rescued from room 205 at the Masters Inn.

36.

Defendants maintained a policy or practice of allowing and facilitating trafficking at the Masters Inn, including the trafficking of K.G. This policy was implemented by, among other things, agreeing to house K.G.'s traffickers, associates, and their victims; knowingly placing K.G. in a secluded and out-of-the-way area of the hotel; concealing her sex trafficking and protecting her traffickers from detection for

conduct they knew or should have known constituted criminal sex trafficking; permitting employees to accept, or failing to prevent employees from accepting, cash payments unrelated to any legitimate business purpose from individuals obviously engaged in commercial sex activity; and supplying the traffickers with the items they needed to sell K.G. and other victims for sex at the Masters Inn.

37.

The Masters Inn established recurring business relationships with K.G.'s traffickers prior to and during the period in which she was sold for sex at the Masters Inn. K.G.'s traffickers were familiar with and familiar to Masters Inn staff from, among other things, previous room rentals to the traffickers during which the traffickers conducted similar sex trafficking and other illegal activity at the Masters Inn. Because it was profitable to maintain this ongoing business relationship, Masters Inn staff furthered and invested in their business relationship with K.G.'s traffickers by renting rooms and providing other services that furthered the traffickers' illicit and dangerous activity at the Masters Inn, including K.G.'s trafficking, despite knowing or having reason to know K.G. was being sold there as a child for sex.

38.

Defendants increased their profits from the sex trafficking of K.G. and other victims, including minors, at the Masters Inn. The Masters Inn monitored the activity at the hotel and, whenever activity at the hotel increased, which the Masters Inn

knew, or should have known, was a result of K.G.'s and other victims' sex trafficking, the Masters Inn increased the prices it charged for room rentals to K.G.'s traffickers so it could make even greater profits.

**II. Plaintiff G.W.'s trafficking at the Masters Inn.**

39.

Beginning when she was only 13 years old, G.W. was illegally harbored, falsely imprisoned, and sold for child sex at the Masters Inn.

40.

G.W.'s sex trafficking at the Masters Inn began no later than January 2011, and she was sold there as a child for sex on and off until November 2016. Plaintiff's trafficking at the Masters Inn comprised ongoing and recurring acts and omissions by Defendants at the Masters Inn, through and including the final days of her trafficking in November 2016. Over the course of her trafficking at the Masters Inn, G.W. was illegally sold for sex to multiple buyers per day, typically over the course of a week or two at a time, every month or so, over the course of multiple years. G.W.'s traffickers took her to the Masters Inn because they knew it would be a good place to sell G.W. for sex.

41.

When she was trafficked at the Masters Inn, hotel staff placed G.W. and her traffickers in a room on the second floor near the pool side of the hotel. The location

concealed its occupants, allowing the trafficking activity to occur with limited risk that it would be detected by law enforcement.

42.

While at the Masters Inn, G.W. was made to have back-to-back sex with 5 to 10 male buyers of sex per day, or more. Defendants knew or should have known that the number of daily, older male visitors to a room in which a perceptibly underage girl was being harbored was clearly indicative of child sex trafficking.

43.

G.W. saw many other girls who, like her, appeared to be minors, based on their features and demeanor, and who were also sold at the Masters Inn for child sex. These girls were also being sold for sex out of rooms on the pool side, second-floor area of the Masters Inn.

44.

Due to the volume of sex acts G.W. was forced to perform, she required towels and other housekeeping items that far exceeded the customary housekeeping needs of a regular hotel guest. These items were used to service the steady stream of men who came to the room to purchase sex and so that G.W. and her buyers could clean off between the back-to-back sex transactions. By providing the requested items, hotel staff supplied the things necessary for G.W. and other trafficking victims to be sold for sex.

45.

Inside G.W.'s room, Defendants' staff observed trash cans filled with numerous used condoms, unused condoms about the room, containers of lube, and other paraphernalia indicating sex trafficking was occurring in the room. Housekeeping staff would dispose of the used condoms and could see G.W., obviously a minor, in the room rented by her trafficker and in which unregistered male guests were frequently entering and exiting to have sex with G.W.

46.

G.W.'s traffickers solicited dates—men who paid to have sex with her—by advertising the young teenager online. G.W. also had to walk the well-known "track" where she would pick up dates and bring them back to the hotel room, which other young girls would also do. In doing so, men who were not registered Masters Inn guests would accompany G.W. and the other girls back through the common areas and premises of the Masters Inn where they had sex with the child for short periods of time (typically no longer than an hour, often less time), and then left G.W.'s room again through the common areas and premises of the Masters Inn. All this degenerate activity occurred in the open for anyone at the Masters Inn to observe.

47.

G.W. saw several other men trafficking other victims at the Masters Inn. It was obvious that these men were pimps. These usually older men would accompany

one or multiple girls they kept a close eye on, jealously watched over, and tightly controlled their movements while they were at the Masters Inn. The victims' demeanor toward the male pimps exercising watchful control over their victims, including young girls like Plaintiff, displayed an obvious relationship of domination and control.

48.

Sometimes, G.W. ran out of condoms because she was being sold to so many men. So she would buy more at the hotel. She interacted with hotel staff during these illicit errands and often wore skimpy, inappropriate clothing for her age and weather while doing so.

49.

G.W. looked like a young girl, especially during the periods when she was sold as a young teenager. It was apparent to anyone who did or could have seen her, including Masters Inn staff, that she was not 18 years old. Before and after she turned 18 years old, Plaintiff's traffickers who sold her for sex at the Masters Inn did so, in part, by fraud, force, threats of force, and coercion. They threatened to deprive her economically of resources, of a place to go, and a place to belong. They used drugs and other substances to lessen her inhibitions, rendering her vulnerable to control. They hit her and were violent or threatened violence to others in her presence, including in the open at the Masters Inn. Plaintiff feared for her own and others' safety

if she did not do what she was told, including having sex with numerous strange men at the Masters Inn. One of Plaintiff's traffickers (all of whom operated in a venture together) was known as a "guerilla" pimp because of how violent and controlling he was to Plaintiff and other victims he sold for sex at the Masters Inn and other places.

50.

Defendants knew or should have known that the number of daily male visitors to the hotel room where G.W. was harbored was clearly indicative of sex trafficking.

51.

Defendants knew or should have known that G.W. was being sex-trafficked as a minor child based on these and other signs and activities indicating sex trafficking. Defendants should have further known that G.W. was, after she turned 18, subject to fraud, force, threats of force, or coercion when she was caused to be sold for sex at the Masters Inn. It was obvious from her demeanor and the demeanor of other, similar victims that her obviously older and controlling male traffickers were coercing her against her will to have sex with the streams of men who came there to purchase her and others. Among others, the obvious signs included: G.W. and other women's traffickers' domineering behavior toward G.W. or other women; controlling tones and words toward G.W. or other women; violence or threats of violence toward G.W. or other women; visible injuries or bruising to G.W. or other women; G.W. or other women's lack of resources or possessions, and similar signs of

dependency or obeisance in the company of the traffickers at the Masters Inn; the use and possession of firearms and similar weapons by G.W. or other women in the open at the Masters Inn; possession and use of drugs or other illicit substances by G.W. or other women, which perceptibly rendered them under the influence of substances and vulnerable to control and manipulation by their traffickers; and a general demeanor between the traffickers and G.W. or other women indicating a non-consensual relationship and engagement in commercial sex.

52.

Defendants had a policy not to call the police regarding known or suspected sex trafficking at the Masters Inn. Defendants followed this policy in the case of G.W. as well as other sex-trafficking victims because the hotel never once reported or encouraged others to report these activities at the property.

53.

On November 7, 2013, G.W. was rescued from just across the street from the Masters Inn, at the nearby Knight's Inn off Lawrenceville Highway. In the weeks prior to G.W.'s rescue there, she had been trafficked at the Masters Inn by some of the same individuals and their associates. After a period in group homes, G.W. was again sold for sex at the Masters Inn by the same traffickers and their associates under similar circumstances alleged herein, off and on, through November 2016.

54.

Defendants maintained a policy or practice of allowing and facilitating trafficking at the Masters Inn, including the trafficking of G.W. This policy was implemented by, among other things, agreeing to house G.W.'s traffickers, associates, and their victims; knowingly placing G.W. in a secluded and out-of-the-way area of the hotel; concealing her sex trafficking and protecting her traffickers from detection for conduct they knew or should have known constituted criminal sex trafficking; permitting employees to accept, or failing to prevent employees from accepting, cash payments unrelated to any legitimate business purpose from individuals obviously engaged in commercial sex activity; and supplying the traffickers with the items they needed to sell G.W. for sex at the Masters Inn.

55.

The Masters Inn established ongoing and recurring business relationships with G.W.'s traffickers over the course of her years-long trafficking at the Masters Inn. G.W.'s traffickers were familiar with and familiar to Masters Inn staff from, among other things, previous room rentals to the traffickers during which they conducted similar sex trafficking and other illegal activity at the Masters Inn. Because it was profitable to maintain this ongoing business relationship, Masters Inn staff invested in and furthered their business relationship with G.W.'s traffickers by renting rooms and providing other services that furthered the traffickers' illicit and dangerous

activity at the Masters Inn, including G.W.'s trafficking, over the entire period in which G.W. was sold for sex at the Masters Inn.

56.

Defendants increased their profits from the sex trafficking of G.W. and other victims, including minors, at the Masters Inn. The Masters Inn monitored the activity at the hotel and, whenever activity at the hotel increased, which the Masters Inn knew, or should have known, was a result of G.W.'s and other victims' sex trafficking, the Masters Inn increased the prices it charged for room rentals to G.W.'s traffickers so it could make more money.

57.

The Masters Inn's participation in G.W.'s trafficking was ongoing and recurred through November 2016, including those periods in which G.W.'s traffickers relocated in between recurring stays at the Masters Inn. The Masters Inn was aware, or should have been aware, that moving locations was necessary and common among sex traffickers and others engaged in illegal and dangerous activity at the Masters Inn, including G.W.'s traffickers. This was routinely done to evade detection by law enforcement (or others who might interfere with the illegal activity and the Masters Inn's participation in their activity). The Masters Inn benefited when persons it knew or should have known were engaged in recurring sex-trafficking operations at the Masters Inn changed locations because it reduced and deterred

unwanted interference by law enforcement or others with Defendants' operation of the hotel and the rampant illegal and dangerous activity that pervaded there. The Masters Inn maintained a policy that kept its premises available and open as a haven for G.W.'s traffickers to use the Masters Inn's rooms, facilities, personnel, and services to continue selling G.W. for sex there whenever the traffickers wanted to do so and each time the traffickers returned with G.W. to conduct their recurring, illegal venture. This policy nurtured the Masters Inn's ongoing and recurring relationship with sex traffickers, including G.W.'s traffickers, even though the Masters Inn knew or should have known of the obviously illegal conduct recurringly occurring there and the obvious efforts to conceal that conduct by continually changing locations.

## III. Defendants' knowledge of crime, including child sex trafficking, at the Masters Inn.

58.

The Masters Inn had a well-established reputation for criminal activity, including prostitution and sex trafficking.

59.

Before, during, and after Plaintiffs' child sex trafficking at the Masters Inn, prostitution, sex trafficking, and child sex trafficking were rampant, frequent occurrences at the hotel that were obvious to employees and guests.

60.

Defendants owned, operated, controlled, or managed the Masters Inn and employed the employees there, giving them specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during and before Defendants' period of ownership and operation of the hotel, but not later than March 29, 2011.

61.

One victim, A.J., whose declaration is attached to this First Amended Complaint,[3] was also sex trafficked at Defendants' hotel on and off for several years beginning in 2013, when she was only 15 years old. A.J. described the Masters Inn as "a playground for the pimps and hoes."

62.

While at the Masters Inn, A.J. was sold for child sex to at least 10 men per day.

63.

A.J. purchased condoms and lubricants from a vending machine in the hotel's front office, in full view of employees who chatted with her during these transactions and plainly observed what she was buying.

---

[3] *See* Ex. 1, A.J. Declaration.

64.

When too many buyers of sex were coming and going from A.J.'s room at the Masters Inn, Defendants' employees would call the room and move them to another area of the hotel.

65.

Defendants' housekeeping staff cleaned A.J.'s room daily and observed signs of child sex trafficking, including used condoms in the trash and condoms, lubricant, wipes, and towels laid out on the dresser.

66.

Once, A.J. was in the room while another girl was meeting a buyer of sex. While the sexual encounter was ongoing, housekeeping staff entered the room to deliver towels and supplies to A.J.

67.

According to A.J., Defendants were fully aware of the sex trafficking and prostitution activity occurring at the hotel, which included young girls hanging around in skimpy clothing, men coming and going from the hotel at all hours, and pimps openly monitoring their girls.

68.

According to A.J., most of the guests staying at the hotel were selling sex, and many appeared to be children like A.J.

69.

A.J. estimates that more than 100 buyers of sex came and went from the Masters Inn each day during her stays.

70.

Another victim, J.L., whose declaration is attached to this First Amended Complaint,[4] was trafficked for sex at the Masters Inn in early 2012. J.L. described the Masters Inn as being "full of prostitution, pimps, and sex trafficking" and estimated that approximately half of the hotel was occupied by girls being sold for sex.

71.

While at the Masters Inn, J.L. had at least 10 men per day coming to the hotel to purchase her for sex.

72.

Staff intentionally placed J.L. and other girls being sold for sex in a secluded and less visible area of the hotel. And J.L. paid housekeepers to keep an eye out and not call the police.

73.

Another victim, C.B.D., whose declaration is attached to this First Amended Complaint,[5] was violently trafficked for sex at the Masters Inn in 2015 and 2016.

---

[4] *See* Ex. 2, J.L. Declaration.

[5] *See* Ex. 3, C.B.D. Declaration.

C.B.D. was forced to see approximately 8 buyers of sex per day. Hotel staff intentionally placed C.B.D. and her trafficker in a room located in a quiet, out-of-the-way part of the hotel.

74.

On two separate occasions, C.B.D. went to the front desk and informed staff that she was being trafficked for sex. When she asked staff to help her or call the police, they told her it was not their job to help.

75.

Malcolm Jones, whose declaration is attached to this First Amended Complaint,[6] stayed at the Masters Inn in 2017 while working construction nearby. During his stays, Jones observed three to five girls walking around the hotel and in the parking lot soliciting men to buy them for sex.

76.

Kameisha Ward, whose declaration is attached to this First Amended Complaint,[7] lived near the Masters Inn for more than a decade and resided at the hotel for approximately nine months beginning in 2021. During that time, she witnessed drugs, prostitution, and other criminal activity occurring openly and continuously on

---

[6] *See* Ex. 4, Malcolm Jones Declaration.

[7] *See* Ex. 5, Kameisha Ward Declaration.

the property. Ms. Ward saw young girls dressed in revealing clothing go into hotel rooms with men who left shortly afterward.

77.

According to Ms. Ward, the hotel manager, Annie, lived on the property and was regularly present, yet did not intervene to stop the prostitution or other criminal activity. When Ms. Ward complained about men knocking on her door at all hours of the night looking for a woman who had previously been prostituted out of her room, management ignored her and threatened eviction if she continued to complain.

78.

Defendants provided a market and rooms for use by sex traffickers when selling victims, including minors like K.G. and G.W., to buyers of commercial sex. This is why Plaintiffs' traffickers brought them to the Masters Inn to be sold for child sex.

79.

Sergeant Hubert L. Brannon, Jr. ("Sgt. Brannon"),[8] a law enforcement officer with more than 30 years of experience and a former supervisor of the DeKalb County Vice Unit and FBI MATCH Task Force operations, supervised undercover investigations at the Masters Inn.

---

[8] *See* Ex. 6, Sergeant Hubert L. Brannon, Jr. Declaration.

80.

According to Sgt. Brannon, commercial sex activity at the Masters Inn was a common and recurring problem for law enforcement. Sgt. Brannon observed that the placement of the commercial sex activity in secluded areas of the Masters Inn was consistent with the practice and policies of hotels that are aware of commercial sex activity but attempt to keep it less visible.

81.

Women informed Sgt. Brannon that hotel staff warned or tipped off pimps when law enforcement were at or approaching the hotel.

82.

Based on his investigation, observations, training, and experience, Sgt. Brannon concluded that employees at the Masters Inn were warning pimps when police were present at the hotel.

83.

Lieutenant C.D. King ("Lt. King")[9] is a law enforcement officer with over 18 years of experience, including service as the lead detective in the DeKalb County Vice Unit beginning in 2015, where he investigated drugs, prostitution, and sex trafficking in coordination with the FBI's MATCH Task Force.

[9] *See* Ex. 7, Lieutenant C.D. King Declaration.

84.

According to Lt. King, drug and commercial sex activity were common at the Masters Inn, and the hotel was a hotspot and "problem hotel" for drug and commercial sex crimes compared to other hotels in DeKalb County. The signs of prostitution and sex trafficking were common sense and apparent to staff, who did nothing to stop or prevent these sex crimes.

85.

Based on his observations, Lt. King estimates that as many as 20 women or girls were engaged in commercial sex at the Masters Inn at any given time.

86.

Defendants had actual or constructive knowledge of the Masters Inn's publicly available online reviews that reported prostitution and crime at the hotel from several years before, during, and for years after Plaintiffs were sex-trafficked there, including the following (reproduced verbatim):

a. May 2011, from TripAdvisor:

   Pimps, Drug dealers, Hookers! STAY FAR AWAY. Talk about a trashy hotel. Blood on the sheets, mold in the shower, they only ever gave us one towel, no shampoo, 3 girls hooking out of the room next to ours, drug deals on every corner. The main pimp for the hotel would always cruise up blasting the same song on his subs so all the girls would hear him come and they'd go downstairs to pay him. When we were checking out a Ford Explorer pulled up, a girl hopped out, the Explorer backed into a spot, and then she came back 20 secs later with a wad of cash and they left. One night my

buddy had to go to the lobby and he had 2 people ask him if he "Had anything to sell". I stepped out of the room one night and had a hooker ask me "want to spend some time with me tonight". Not safe to leave the rooms after dark. There were cops at the hotel every night we were there. Another person we knew who was staying there had roaches in their room. They also have no restroom the "public" can use in the lobby. I got there a few mins prior to my buddy who was checking us in and I found that one out. Guess I should have known the hotel was crappy when we walked up and you couldnt even see the bottom of the pool where it was 3 1/2 feet deep.

b. May 2011, from TripAdvisor:

DO NOT STAY AT THIS HOTEL...........Pimps, Drug Dealers, Hookers !! The Room Was Nasty ........Not Safe.......They Put Us In A Drug Room...........Will Never Come To This Hotel Again...... Never Again.......Please Stay Away............This Is The Worst Hotel I Ever Been In.................

c. September 2013, from TripAdvisor:

This is the worst place I have ever seen. . . . [T]he carpets were stained and the hooker and john that checked in next to us had my child asking about the sounds coming from their room. Never again!!!!

d. February 2014, from Yelp.com:

It was the worst hotel experience ever!!!!!! Weird people walking around the parking lot all night. Extremely loud music in the room next door. . . .

e. 2014, from Google Reviews:

Most of these reviews are lies the place is rampant with drugs and prostitutes. And the rooms are not cleaned if you complain the( Ms patel) stalks you. very unsafe. this is just a warning

f. 2015, from Google Reviews:

STAY AWAY, DO NOT TRAVEL HERE UNLESS YOU ARE DRUGGING OR INTERESTED IN REALLY TRASHY HOOKERS!!!! You can't go outside of your room without someone trying to sell you ONE OR THE OTHER! Also it Seems as if the so called mgt there is working with them. Because anytime you TRY to complain, "Big DIP$#*+" Anne, who is only the housekeeping mgr, REALLY does thinks she's the boss, and will actually shrew you away! We stayed here for over a month due to our own personal mistake! Today, We wouldn't send even our worst enemy here! THEY, are too good for this CRACK PIPE SMOKING, HOOD-RAT HOOKER MOTEL!!!!

g. <u>2015, from Google Reviews:</u>

Do not let the pineapple in the logo fool you, the Masters Inn is a terrible place and I can only imagine that the 5 star reviews for this Inn are in fact false. I arrived to the hotel in the middle of a police raid with prostitutes running around and pimps standing their ground against the police. I made the poor decision to look at the room I had just paid for only to find that the room, already disgusting with a foul smell, had just been "used" and not cleaned before my arrival. I immediately ran to the lobby to get a refund within the 15 minute window (a rule they instated for obvious reasons). The hotel manager argued with me before giving a refund and I left as fast as I could.

h. <u>2015, from Google Reviews:</u>

This place was horrible! . . . It is right next to highway 285 constant noise all night long and the place is filled with prostitutes and drug addicts stay away!

i. <u>2016, from Google Reviews:</u>

NEVER STAY AT THIS PLACE, EVER. Its filthy, dirty, and filled with beg bugs, roaches, and other bugs. Plus there a lot of crime. A LOT.

j. <u>2016, from Google Reviews:</u>

Terrible! I cant even go to the vending machine without being hassled for money, sex, or drugs. . . . this hotel is a nightmare.

k. 2016, from Google Reviews:

. . . NEVER STAY HERE!!!!!!! I even witnessed the front desk agent let a girl who was clearly a prostitute check in with no ID! This place is trash! But they do have free WiFi lol. So I guess they figure they can do what they want. TRASH! Also I can damn near promise you that all of these good reviews are from prostitutes and there pimps. Smh shady ass place.

l. February 2016, from Yelp:

. . . [T]he illegal activity makes you fear for your safety and the type of people that stay here seem to all be looking for long term stay or they are all sketchy homeless so some have multiple people in their room and they look and behave strange.

m. February 2016, from Yelp:

. . . The owner is very greedy and allows illegal activities to take place. It was nothing to see pimps and prostitutes! I believe for an extra fee he lets this take place because all the housekeepers knew this guy by name, and talked to him like an employee while he rented his room out for these activities! . . .

n. September 2016, from Yelp:

I have never had such a horrendous experience in my life. First, the desk staff was extremely rude to us, like we were bothering her to be there, then when we finally got up to out room, we noticed some strange insects that we encountered while sitting on the bed, so I pull the sheets away from the mattress to investigate, and other found something even more disturbing... blood stains, like a lot of them. More than something like a feminine accident or something like that, it was a lot of blood. So I go to the desk to complain, and try and get a refund, the Indian guy at the desk refused, and called the cops on us for demanding a refund. Also I'm pretty sure they

arrested a prostitute from a neighboring room. "Masters inn"? More like" murder Inn".

o. 2017, from Google Reviews:

We stopped by to rent 2 rooms for our family after driving hours and looking for a hotel. Upon sitting down in the bed and pulling back the bedspread, there laid a crack pipe. Yes, you read that correctly. A crack pipe. That was disturbing enough, but to think that 1 of 2 things had happened. Either they didn't change the sheets or the cleaning people left it there. Don't know which. Needless to say, I was not going to let my children sleep where laid a crack pipe so we left. Lots of questionable activity around the hotel. People coming and going continuously. Nonsmoking rooms smell like smoke. The only good thing I can say was the receptionist was nice. Don't even stop here. You will have to pay over $100 to find a decent hotel in this area. But better safe than sorry.

p. September 2017, from TripAdvisor:

. . . [T]here was people going from floor to floor. I do not know what they where looking for. The neighborhood is extremely bad. Do not waste your time. The rooms are not even worth a dollar a night.

q. 2018, from Google Reviews:

Horrible. Hookers. Drug dealers and roaches load and dirty

r. January 2018, from Kayak:

Rooms smelled, staff refused to correct problem until a manager was requested, no smoke alarms operational. Hookers roaming hotel would never recommend at all.

s. 2019, from Google Reviews:

Further more, every night was very noisy, some weird creepy guy walks around all day and night watching and following people. . . . Also this place breaks many hotel and hospitality violations. Do

not stay here and be taken advantage again. This place will never receive my business again nor would I recommend it to anyone! I will contact the better business bureau on this matter.

t. <u>2019, from Google Reviews:</u>

. . . a women did get beat up outside my room by some guy police never showed up she just took an L

u. <u>2020, from Google Reviews:</u>

Super sketchy place. . . . When we tried getting an uber, they wouldn't in to the hotel parking lot. We could see them driving up to the property way out of reach from the hotel and we tried communicating with them to come closer but they wouldn't respond and we would just receive a notification letting us k iw they were sending a different driver. We booked an uber THREE TIMES!! Before the 4th one actually showed up and that uber driver told us that we were in a "rough" part of town and were afraid to come into that hotel property.

v. <u>February 2020, from Kayak:</u>

. . . I checked IN with multiple rooms open but the staff member put me DIRECTLY beside a couple that fought and had domestic issues. Police were called and got NO rest. Very unaccomodating.

w. <u>2021, from Google Reviews:</u>

Not enough towels, shoes and drug paraphernalia was left there by last renter, check in staff was extremely rude, and alot of traffic in front of the room I was renting. Also TV only had 9 working channels.

x. <u>April 2022, from Kayak:</u>

Many people loitering around. A man asked me why I was traveling alone? How would he know that? Was he watching me? 2 men screaming and yelling at each other in parking lot. Did not feel safe there. Was charged additional $81 after prepaying online. Why?

y. March 2023, from Kayak:

> . . . People standing in the stairway with skimask on like they were getting ready to rob u

z. 2024, from Google Reviews:

> . . . On the drive up to the hotel lobby, I seen one naked woman open the door for a man then another naked woman covered with only a sheet, hopping inside a vehicle. Why didn't I turn my car around at this point? The lord only knows. . . . Whatever you do, please do not spend a dime here. You've been warned!

aa. 2024, from Google Reviews:

> . . . [A]bout an hour into our stay we heard several extremely loud gun shots which sounded like it happened right next to our room. I have never had something that scary happen so we were ready to dip! . . .

bb. June 2024, from Priceline:

> Prostitution and drugs bad all the time cops cops" - Police police police people kicking doors screaming kids running around at night time when she be in it's drug infested

cc. January 2025, from TripAdvisor:

> This was the worst experience I have ever had staying in a motel. . . . The whole vibe was creepy - throughout the property. A damaged car with blacked out windows followed me slowly around as I searched for a place near my room to park. . . . I do not exaggerate. I do not bother to leave reviews normally. But this place was beyond belief.

dd. March 2025, from Booking.com:

> . . . area is gloomy, and check-in is done through a drawer and speaker with a receptionist. Seems like a crime-ridden area all around. . . .

ee. April 2025, from Expedia:

> Go elsewhere. The area was shady at best. Had a strange man follow me and try to keep talking to me at checlin until he found out i was with my father then he disappeared. Went to the convenient store next door and had a man rush out the store behind me until i got to my car and he saw my father inside waiting for me then he turned around real fast. . . .

ff. June 2025, from Priceline:

> Fine, but maybe you can try to find something better. And check the location, according to chat GPT, sex offender was [a]t," . . .

87.

Defendants knew or should have known of these and other customer reports about the nuisance created by dangerous, criminal activity that occurred at the Masters Inn.

88.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the Masters Inn and criminal activity that is commonly known to accompany sexual crimes like prostitution and sex trafficking. Much of this activity either alerted or should have alerted Defendants to the hotel's rampant sex trafficking, prostitution, and sex crime problem. As inexhaustive examples, the police responded to the following incidents at the hotel over the previous 15 years:

a. On July 15, 2011, a victim reported being **sexually assaulted** at the Masters Inn.

b. On September 16, 2011, the DeKalb County Vice Unit conducted a prostitution sting at the Masters Inn and arrested a female for **prostitution**.

c. On September 29, 2011, a woman reported that her boyfriend physically assaulted her in the parking lot of the Masters Inn by punching her with a closed fist multiple times in the face.

d. On March 14, 2012, the DeKalb County Vice Unit conducted a prostitution sting at the Masters Inn in conjunction with the Internet Crimes Against Children Unit and arrested a female for **prostitution**.

e. On March 22, 2012, the DeKalb County Vice Unit conducted a police operation targeting prostitutes at the Masters Inn and arrested a female for **prostitution** and another individual for **pimping** and **keeping a place of prostitution**.

f. On June 15, 2013, a woman reported that a man placed her in a headlock in the parking lot of the Masters Inn and attempted to pull her back into a room.

g. On June 23, 2013, another woman reported that she was physically assaulted by her boyfriend at the Masters Inn.

h. On August 8, 2013, the DeKalb County Vice Unit conducted a police operation targeting prostitutes at the Masters Inn and arrested three females for **prostitution**.

i. On January 30, 2014, the DeKalb County Vice Unit conducted an undercover operation at the Masters Inn and arrested a female for **prostitution**.

j. On January 19, 2015, a woman stabbed her boyfriend in the throat after he entered her room while she was sleeping, climbed on top of her, and began choking her.

k. On January 27, 2015, a victim reported being held against her will at the Masters Inn after her assailant choked her, prevented her from leaving the room, and threatened to harm her if she attempted to seek help.

l. On March 2, 2015, multiple bullet holes were discovered in the walls and ceiling of rooms 230 and 231 at the Masters Inn. A full metal jacket handgun round was found lodged in the wall above the television.

m. On March 26, 2015, the DeKalb County Vice Unit conducted a prostitution sting at the Masters Inn, and a female was arrested for **prostitution**.

n. On May 15, 2015, the DeKalb County Vice Unit conducted a prostitution sting at the Masters Inn. During this operation, a juvenile was rescued and a second individual was charged with **human trafficking, pimping, keeping a place of prostitution,** and **prostitution**.

o. On August 11, 2015, a woman reported getting into a physical altercation with a male at the Masters Inn, during which he struck her in the face.

p. On August 25, 2015, the DeKalb County Vice Unit conducted an undercover operation at the Masters Inn and arrested a female for **prostitution** and a male for **keeping a place of prostitution**.

q. On October 13, 2015, a woman reported that after meeting a man and renting a room at the Masters Inn, a dispute arose over money. During the argument, the man allegedly threatened to retrieve a gun and shoot her.

r. On April 8, 2016, a woman reported getting into a physical altercation with a male, during which the man pushed the woman and grabbed her arms with both of his hands.

s. On April 28, 2016, the DeKalb County Vice Unit conducted a prostitution operation at the Masters Inn and arrested a female for **prostitution**.

t. On May 24, 2016, an individual reported being **raped and assaulted** at the Masters Inn.

u. On June 23, 2016, officers observed a man at the Masters Inn aggressively banging on the door of room 112 and yelling at the occupant inside. The man was taken into custody and cited for disorderly conduct.

v. On June 29, 2016, the DeKalb County Vice Unit conducted a prostitution operation at the Masters Inn and arrested a female for **prostitution** and **keeping a place of prostitution**.

w. On October 6, 2016, a woman reported that she was assaulted by a man at the Masters Inn, who grabbed her, threw her to the ground, kicked her, and took her phone in the hotel parking lot.

x. On February 11, 2017, officers responded to room 110 of the Masters Inn regarding a report of a possible sexual **assault and found a housekeeper actively cleaning the room**. The officers immediately ordered her to stop. The employee advised that she had already bagged several items and removed bedding from the room before being stopped.

y. On July 20, 2017, the DeKalb County Vice Unit and the Federal Bureau of Investigation Metro Atlanta Child Exploitation Task Force (MATCH) conducted an operation in connection with child and adult prostitution at the Masters Inn. During this operation, a female was charged with **prostitution** and a male was charged with **pimping**.

z. On December 25, 2017, a female reported she got in a verbal and physical altercation with her boyfriend, who struck her in the face at the Masters Inn.

aa. On January 21, 2018, Masters Inn staff found a Mossberg 500A 12-gauge shotgun with what appeared to be a sawed-off barrel and taped pistol grip left behind in room 201. A records check confirmed the shotgun had been reported stolen.

bb. On March 20, 2018, a victim reported being **raped** at the Masters Inn.

cc. On April 25, 2018, the DeKalb County Vice Unit conducted a prostitution operation at the Masters Inn and arrested a female for **prostitution**.

dd. On September 25, 2018, a woman reported that she was assaulted by her ex-boyfriend at the Masters Inn, who struck the victim with a closed fist.

ee. On December 20, 2018, a woman reported that she was assaulted by her ex-boyfriend at the Masters Inn, who struck the victim in the face with a closed fist.

ff. On April 20, 2019, a woman reported that she was assaulted by her boy-friend at the Masters Inn.

gg. On March 23, 2020, a woman reported that she was assaulted by her boy-friend at the Masters Inn, who slapped the victim in the face, head-butted her nose, and attempted to drag her out of their hotel room.

hh. On May 5, 2020, a woman reported that she was assaulted by her boyfriend at the Masters Inn, who attacked her in the parking lot of the Masters Inn.

ii. On November 19, 2020, a woman reported that a man **exposed himself to her and masturbated** while watching the woman at the Masters Inn.

jj. On January 4, 2021, a woman reported that her ex-boyfriend assaulted her at the Masters Inn. The victim reported that the assailant struck her repeatedly with a plastic blind rod and bit her on the face.

kk. On January 30, 2021, a woman reported being **sexually assaulted** at the Masters Inn.

ll. On April 6, 2021, a man reported that he **went to the Masters Inn to meet a woman he had met online** but left after realizing she did not match her online profile. While walking through the parking lot, he was confronted by a man who exited a nearby room and argued with him about the woman. The man then struck the victim in the jaw with a handgun.

mm. On April 19, 2021, a woman was shot outside room 318 at the Masters Inn.

nn. On March 16, 2023, the DeKalb County Vice Unit and the Tucker NET Team conducted a **prostitution sting** at the Masters Inn. During this operation, one individual was charged with **prostitution** and **keeping a place of prostitution**.

oo. On June 14, 2024, a woman reported that she was assaulted by a man at the Masters Inn, who snatched her phone, placed his hands around her neck

until she lost consciousness, and struck her in the face with a handgun before punching her in the face with a closed fist.

pp. On July 24, 2024, a shootout occurred at the Masters Inn after a woman reported being harassed by several individuals, prompting her boyfriend to confront them, which escalated into gunfire.

89.

Defendants knew or should have known of these and other reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

90.

Defendants and their employees knew or should have known that obvious sex trafficking, including K.G.'s and G.W.'s sex trafficking, was occurring at their property, at times with the assistance of their employees.

91.

Despite the dangerous, illegal, and criminal activity surrounding the property, Defendants and the hotel negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

92.

Despite having actual or constructive knowledge of this illegal activity, Defendants negligently failed to take reasonable steps to stop such illegal and dangerous activities from occurring, including that involving their own employees.

93.

Additionally, Defendants negligently failed to provide proper training to their employees, including, among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the hotel.

94.

Defendants also negligently failed to supervise their employees to ensure the hotel was not facilitating sex trafficking and participating in sex trafficking through the business of the hotel, as was the case with Plaintiffs' trafficking.

95.

Defendants also negligently failed to train their staff in a reasonable and uniform manner, including, among other things, how staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so the hotel could better deter or prevent crime in the future.

96.

Defendants also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at

the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

97.

Defendants knew or should have known that they were permitting the hotel to be used as a place of prostitution and sex trafficking.

**IV. Defendants' knowledge of sex trafficking generally.**

98.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

99.

Defendants knew or should have known that during the relevant period Atlanta was (and remains) a national hub of sex trafficking and that the crime was prevalent in the city, including at the Masters Inn. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly

earnings of roughly $33,000.[10] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendants benefited from some of those illicit profits by rental rates paid for the hotel rooms used for the trafficking of Plaintiffs.

100.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[11] and as "the number one city for child sex trafficking."[12]

101.

Defendants knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on

---

[10] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable,* Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Feb. 20, 2026); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30-32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Feb. 20, 2026).

[11] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Feb. 20, 2026).

[12] *Id.*

threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

102.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving motels and hotels were sex trafficking cases, and another 2.6 percent reported a combination of sex and labor trafficking.[13] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[14] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[15] Unfortunately,

---

[13] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://respect.international/wp-content/uploads/2020/11/National-Hotline-Cases-Occurring-in-Hotels-and-Motels-.pdf (last visited Feb. 20, 2026).

[14] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

[15] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Feb. 20, 2026).

"94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[16]

103.

Defendants knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[17] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[18]

104.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[19]

---

[16] *Id.* at 23.

[17] Rich Keating, *Human Trafficking: What Is It and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), https://perma.cc/X5DG-YQ3M.

[18] *Id.* at 19.

[19] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Feb. 20, 2026).

105.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

a. establish corporate policy and procedures against sexual exploitation of children;

b. train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

c. include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

d. provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e. support, collaborate, and engage stakeholders in the prevention of sexual exploitation of children; and

f. report annually on the company's implementation of Code-related activities.

106.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking.

107.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

b. persons who lack freedom of movement or are constantly monitored;

c. persons who have no control over or possession of money or ID;

d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

f. the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g. extended stay with few or no personal possessions in the room;

h. excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i. the same person reserves multiple rooms;

j. a room is rented hourly, less than a day, or for an atypical extended stay;

k. attempts to sell items to or beg from patrons or staff;

l. cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons;

n. waiting at a table or bar and picked up by a male (trafficker or customer);

o. persons asking staff or patrons for food or money; and

p. persons taking cash or receipts left on tables.

108.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and peddle sex—sex trafficking would cease to exist. In Plaintiffs' case, the Masters Inn, for a fee, provided this market for Plaintiffs to be confined and sold.

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

109.

Plaintiffs incorporate the foregoing and following allegations as if fully restated herein.

110.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefited from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

111.

Defendants knowingly benefited from Plaintiffs' sex trafficking by receiving revenue generated by the operation of the Masters Inn, including the revenue generated for the rooms in which Plaintiffs were trafficked as alleged herein. Each day Plaintiffs were trafficked at the Masters Inn, Defendants knowingly benefited by receiving money from Plaintiffs' trafficking in the form of room-rental and other fees.

112.

Defendants' operation of the Masters Inn constituted a venture.

113.

Defendants participated in their hotel venture and knew or should have known that their operation of the hotel violated the TVPRA by harboring and falsely imprisoning Plaintiffs so that Plaintiffs could be sold for sex as a minor at the Masters Inn.

114.

Defendants also participated in a venture involving one or more of Plaintiffs' sex traffickers. The rental of rooms for profit to Plaintiffs' sex traffickers, rooms in which Plaintiffs and others were sold for sex to generate revenue for Defendants, also constituted a venture under the TVPRA.

115.

The ventures in which Defendants participated were in or affecting interstate commerce. Defendants opened their motel to and operated it as a house of lodging to serve (and which actually served) individuals who traveled to the motel from other states and/or foreign countries. Defendants also used the instrumentalities of commerce (*e.g.*, the internet, mail, purchase of supplies and equipment from outside the state of Georgia for shipment to the hotel for use and/or resale at the Masters Inn, like condoms and other personal care products, and communication with and use of services located outside the state of Georgia to further the Masters Inn's operations), to further and to conduct their business of operating the Masters Inn. The nature of

Defendants' operation of a motel and provision of products and services provided in attendance therewith, generally, as well as all those individuals involved in the ventures in which Defendants participated (including Plaintiffs' illegal sex trafficking), specifically, had a substantial effect on or were otherwise conducted by means of interstate commerce.

116.

Defendants' harboring Plaintiffs as part of their sex trafficking constituted false imprisonment. At times, Plaintiffs' false imprisonment at the Masters Inn was independent of any other aspect of their trafficking, such as sexual encounters, assaults, or batteries they may have endured.

117.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives participated in Plaintiffs' sex trafficking at the Masters Inn. Defendants knew or should have known of this participation.

118.

Defendants also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Masters Inn.

119.

Defendants' acts or omissions as alleged herein, including their ownership, operation, management, and control of the Masters Inn and other acts or omissions during the course of their participation in the ventures as alleged herein, were sustained, recurring, and ongoing violations of the TVPRA over the course of Plaintiffs' trafficking at the Masters Inn. These ongoing and recurring violations did not stop until the last time that Plaintiffs were sold for sex at the Masters Inn.

120.

Defendants are directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

121.

Plaintiffs have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in the ventures alleged herein.

122.

Defendants are liable to Plaintiffs for damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

123.

Thus, as described herein, Defendants are jointly and severally liable to Plaintiffs for damages arising from the indivisible injuries they caused Plaintiffs, whose damages were proximately caused by the acts alleged herein.

**COUNT II**
**NUISANCE**

124.

Plaintiffs incorporate the foregoing and following allegations as if fully restated herein.

125.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

126.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

127.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

128.

O.C.G.A. § 41-3-1 provides: "Whosoever shall knowingly erect, establish, continue, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

129.

The Masters Inn's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

130.

The Masters Inn caused or contributed to a blighting effect on the surrounding community, so that the Masters Inn negatively damaged all persons who came within

the sphere of operation of the crime, sex trafficking, and prostitution at the Masters Inn, although the effects on each person may have varied.

131.

The illegal prostitution and sex trafficking nuisance occurring at the Masters Inn had an appreciable blighting effect on the surrounding community, attracted and allowed persons of questionable character in their illicit and dangerous conduct, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

132.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Masters Inn caused special damages to Plaintiffs, who, as victims of child sex trafficking at Defendants' nuisance hotel, suffered damages to their health, including mental and emotional harm, pain and suffering, and Defendants are liable to Plaintiffs for all such damages.

**Public Nuisance Per Se**

133.

The Masters Inn constituted a statutory nuisance per se under Georgia law because Defendants knowingly and/or negligently turned a blind eye and permitted illegal sexually related crimes to occur at the Masters Inn, including sex trafficking.

134.

A business where illegal practices are permitted constitutes a nuisance.

135.

A business, like the Masters Inn, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

136.

Plaintiffs were directly harmed as a result of the sex crime nuisance at the Masters Inn that permitted illegal sexual activity to occur there.

137.

Defendants are liable for nuisance (public nuisance and/or per se public nuisance) by reason of their failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as an ongoing and recurring condition and of which Defendants had express notice and knowledge, and whereby Plaintiffs were direct victims of such activity.

## COUNT III
## STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255

138.

Plaintiffs incorporate the foregoing and following allegations as if fully set forth herein.

139.

Plaintiffs were under the age of 18 when they were trafficked at the Masters Inn.

140.

Plaintiffs were victims of violations of 18 U.S.C. § 1591 at the Masters Inn.

141.

As described herein and specifically in paragraphs 109–23, Defendants knowingly benefited from participating in a venture that they knew or should have known engaged in an act of sex trafficking at the Masters Inn, including the harboring and other trafficking activities which harmed Plaintiffs.

142.

Plaintiffs suffered personal injury as a result of Defendants' violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

143.

Thus, as described herein, Defendants are jointly and severally liable to Plaintiffs for compensatory and punitive damages, in an amount to be determined at trial.

**DAMAGES**

144.

Plaintiffs incorporate the foregoing and following allegations above as if fully restated herein.

145.

As a proximate and foreseeable result of Defendants' violations of the TVPRA and Georgia law, Plaintiffs sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiffs bring each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general, and punitive damages permissible under Georgia and federal law. Plaintiffs seek all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a. Personal injuries;
b. Past, present, and future conscious pain and suffering;
c. Loss of enjoyment of life;
d. Mental anguish and emotional distress;
e. Incidental expenses;
f. All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and
g. Consequential damages to be proven at trial.

146.

Plaintiffs are entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

147.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs undue expense. Thus, Plaintiffs are entitled to recover necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68, and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiffs are entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

* * *

WHEREFORE, Plaintiffs pray for a judgment to be awarded to each of them and against Defendants and that the Court further order the following:

a. Process issue as provided by law;
b. Plaintiffs each be awarded actual damages in amounts to be shown at trial from Defendants;

c. Plaintiffs each be awarded all general, special, compensatory, economic, consequential, punitive, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

d. Plaintiffs have all issues determined in a trial by jury; and

e. Plaintiffs have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on October 2, 2026.

ANDERSEN, TATE & CARR, P.C.

*/s/ Stephen Morrison*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
STEPHEN D. MORRISON, III
Georgia Bar No. 700828
smorrison@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiffs*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097

(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Stephen Morrison*
STEPHEN D. MORRISON, III
Georgia Bar No. 700828
smorrison@atclawfirm.com
*Attorney for Plaintiffs*

# Exhibit 1

A.J. Declaration

**DECLARATION OF [redacted]**

[redacted] pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is [redacted]. I am more than twenty-one years of age, competent to testify, and have no legal or mental disability. This declaration was executed in the state of Georgia, where I am currently located.
2. I was a victim of child sex trafficking at the Master's Inn, located at 1435 Montreal Road, Tucker, Ga 30084, off and on from November 2013 through February 2014, when I was 15 years old. I was later trafficked at the Master's Inn off and on from June 2015 through 2020.
3. My traffickers chose the Master's Inn because it was a place where they could blend in, where that kind of activity was already happening, and where people working at the hotel were aware of and involved in what was going on.
4. From November 2013 through February 2014, I would see more than 10 men for sex each day at the Master's Inn. It was often back-to-back. I sometimes made up to $10,000 in one day. From June 2015 through 2020, I was still seeing more than 10 men for sex each day at the Master's Inn.
5. If there were too many visitors coming to our room, the hotel would call and move us to another area so guests wouldn't complain.

6. Housekeeping cleaned my room every day and often saw signs of sex work, like trash can full of used condoms and a setup on the dresser with condoms, lube, wipes, and towels.
7. Once, I was in the room with a girl who was meeting a man who paid for sex. While they were having sex, a hotel housekeeper came into the room to drop off towels. The housekeeper gave me the towels and supplies, then left.
8. When I ran out of condoms or lube, I could buy more from the vending machine in the front office. The front desk staff would chat with me while I made my purchase, and they could clearly see what I was buying.
9. There was a lot of prostitution and sex trafficking when I was at the Master's Inn. It was very blatant. The girls that were selling sex at the Master's Inn were all wearing skimpy clothes to advertise themselves for sex. The majority of the guests staying at the hotel were selling sex. Half of the girls being sold for sex looked young like me.
10. It was common to see pimps trafficking more than one girl at a time at the Master's Inn. Most of the girls and women there had pimps.
11. The Master's Inn was a playground for the pimps and hoes. This was true the entire time I was trafficked there.

12. There were always people hanging around the property. Young girls would stand around outside wearing very skimpy clothes and walking around to find a buyer in the parking lot.

13. When I was at the Master's Inn, there were well over 100 men who came to the property each day. It was common to see men arriving at all hours, parking for short periods of time, and then leaving.

14. The Master's Inn was located on a well-known track. I often met buyers of commercial sex while walking the track and brought them back to the Master's Inn.

15. The employees at the Master's Inn knew what was going on. The activity was obvious. There were always young girls hanging around, men coming and going from the hotel at all hours, and pimps openly watching the girls. The staff saw this every day and did nothing to stop it.

16. Under 28 U.S.C. § 1746, I declare under penalty of perjury that this Declaration comprising 16 numbered paragraphs is true and correct. Executed on November 4, 2025.

[redacted]

[redacted]

# Exhibit 2

J.L. Declaration

**DECLARATION OF [redacted]**

[redacted], pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is [redacted]. I am more than twenty-one years of age, competent to testify, and have no legal or mental disability and have personal knowledge of the facts stated herein. I freely give this declaration for use in this case. This declaration was executed in the state of New York, where I am a resident.
2. In early 2012, I was trafficked for sex in Atlanta and also worked independently at the Master's Inn located at 1435 Montreal Rd., Tucker, Georgia 30084. When I was at the Master's Inn I had at least 10 men a day coming to the hotel to buy sex. The hotel intentionally placed me and other girls being sold for sex on the back side of the hotel.
3. When I was there, I paid the housekeepers to keep an eye out and not call the police. Each day I paid for the room in cash.
4. The Master's Inn was full of prostitution, pimps, and sex trafficking. It was obvious. About half the hotel was taken up by girls being sold for sex. There was no way the hotel couldn't have seen this activity.
5. I have read this Declaration consisting of 5 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on January 26, 2026.

Signed by:
[redacted] ______________________________

[redacted]

# Exhibit 3

C.B.D. Declaration

**DECLARATION OF [redacted]**

[redacted], pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is [redacted]. I am more than twenty-one years of age, competent to testify, have no legal or mental disability and have personal knowledge of the facts stated herein. I freely give this declaration for use in this case. This declaration was executed in the state of Georgia, where I am currently located.

2. In 2015 and 2016, I was violently trafficked for sex at the Masters Inn. I stayed there multiple times, including one stay that lasted about three weeks to a month. While I was there, my trafficker pistol whipped me and abused me physically and verbally.

3. Each day, I was forced to see about 8–12 buyers of sex per day. The buyers would be in the room for about 30 minutes to an hour at a time and then leave. While I was with a buyer, my trafficker would leave the room but stay close by, watching and waiting for the buyer to leave. As soon as the buyer left, my trafficker came back into the room to take the money.

4. Hotel staff placed us in a room that was in a quiet, out-of-the-way part of the hotel. Most regular guests did not walk past our room. Food was delivered to the room multiple times while I was at the hotel.

5. Housekeeping did not clean the room during my stay. They would knock on the door, and my trafficker would open it and tell them we did not need service.

6. On two different occasions, I went to the front desk and told staff what was happening to me at the hotel. The staff could see my clothing, like crop tops, short shorts, and high heels, that made it obvious that I was being sold for sex. The staff asked me what I wanted them to do. When I asked them to help me or call the police, they told me it was not their job to help.

7. I have read this Declaration consisting of 7 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on February 6, 2026.

Signed by:

[redacted]

[redacted]

# Exhibit 4

# Malcom Jones Declaration

**DECLARATION OF MALCOLM JONES**

Malcolm Jones, pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is Malcolm Jones. I am more than twenty-one years of age, competent to testify, and have no legal or mental disability and have personal knowledge of the facts stated here. I freely give this declaration for use in this case. This declaration was executed in the state of Georgia, where I am a resident.
2. In 2017, I stayed at the Master's Inn located at 1435 Montreal Rd., Tucker, Georgia 30084. I worked on a construction crew that was working on Lawrenceville Highway in front of the hotel. I would stay at the hotel for a week, go home on the weekend and then come back to work on Monday. This lasted probably a month or two.
3. When I was at the Master's Inn after work, I saw 3–5 girls who were walking around the outside of the hotel or in the parking lot, soliciting men to buy them for sex. These girls would be wearing skimpy clothes that looked like they were trying to sell sex.
4. As a joke, one of the guys I worked with sent some of these girls to the room of another co-worker. And the girl showed up. The guy tried to kick that girl out

and it caused a scene because the girl was upset she wasn't getting paid a date. She said she wasn't going anywhere until someone paid her some money because she had spent money on an Uber over there. She was yelling and it was near the front office. The guy at the front desk heard this argument going on and told the girl who was causing a scene she needed to leave.

5. I have read this Declaration consisting of 5 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on February 2, 2026.

DocuSigned by:

CD1DF9CE155A460...

Malcolm Jones

# Exhibit 5

Kameisha Ward Declaration

# DECLARATION OF KAMEISHA WARD

Kameisha Ward, pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is Kameisha Ward. I am more than twenty-one years of age, competent to testify, have no legal or mental disability and have personal knowledge of the facts stated herein. I freely give this declaration for use in this case. This declaration was executed in the state of Georgia, where I am currently located.

2. I lived at the Masters Inn at 1435 Montreal Road in Tucker, Georgia 30084, for about 9 months around 2021 to 2022. I lived there with my children. I grew up in the area and am familiar with the hotel and its staff. I saw many of the same people who worked at the hotel for a decade or more, including the manager of the hotel, Annie, who also lived on the property. Annie was often rude, especially to women. She didn't care about the drugs, prostitution, and other crime on the property or do anything to intervene or prevent it. Annie was strict about certain things, like people who were in a county program living at the hotel because they wanted to rent rooms to other people.

3. I saw a lot of drugs, prostitution, and other crime during the entire time that I lived there. You could tell there were drugs and prostitutes because people would come from across the street from other hotels to sell drugs. I saw a lot

of drug transactions happen on the property. I also saw girls who only came out at night. Some of the women appeared younger and many of them looked like they were on drugs. They dressed like adults with short shorts, dresses, and lots of makeup like prostitutes. These women would hang around with other men on the property who would go into rooms with them and leave shortly after. While I lived there I never saw any security guards or other staff patrolling the property for safety.

4. There was a man who also stayed at the Masters Inn for an extended period of time with three girls he called his kids. I never saw these kids go to school or line up for the bus in the mornings. At night, the girls would come out and walk around the hotel dressed like adult prostitutes wearing high heels, short dresses, false eyelashes, and lots of lipstick that was unusual for girls their age.

5. For a few months, I lived in a room on the front side on the third floor. Then, after a couple of months I was moved to a different room on the first floor at the Masters Inn on back side of the hotel by the highway. When I moved to this room I had  several different men knock on my door at all hours of the night asking for a specific woman who they appeared to know and asked if she was still in the room. I learned that the person who stayed in the room before me was a prostitute. I complained about the men coming to my room

to management who ignored me and told me if I kept complaining that I would be kicked.

6. I saw adult men going and coming at the hotel all the time. They would pull up to the hotel, park, and go to a room for 30 minutes or so, and then come back out.

7. I have read this Declaration consisting of 7 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on February 17, 2026.

Signed by:
Kameisha Ward
163C0566DAC64EF...

Kameisha Ward

# Exhibit 6

# Hubert L. Brannon Declaration

**DECLARATION OF HUBERT L. BRANNON, JR.**

Hubert L. Brannon, pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is Hubert L. Brannon, Jr. I am more than twenty-one years of age, competent to testify, have no legal or mental disability and have personal knowledge of the facts stated herein. I freely give this declaration for use in this case. This declaration was executed in the state of Georgia, where I am currently located.

2. I have worked in law enforcement for over thirty years. I am currently an investigator with the Georgia Department of Drivers Services. Prior to my current position, I was with the Fulton County Solicitor's Office as an investigator (3) and Fulton County Sheriff's Office as a Sergeant. Prior to that, I served as a Lieutenant with the DeKalb County Police Department from approximately 2019 to 2021, and as a Sergeant from approximately 2009 until I was promoted to Lieutenant in 2019.

3. While a Sergeant with the DeKalb PD, I supervised undercover operations with the Dekalb County Vice Unit, which was also part of the FBI's Metro Atlanta Child Exploitation ("MATCH") Task force. In that role, I worked in coordination with the FBI and was issued FBI task force credentials.

4. The Vice Unit was responsible for investigating vice crimes (e.g., drugs, prostitution, human trafficking) in Dekalb County and throughout the metro Atlanta area. I worked on one hundred investigations or more relating to vice crimes, including drugs, prostitution, and human trafficking. I supervised undercover operations as part of my responsibilities as a Vice Unit officer.

5. Over the course of my career with the Vice Unit, I participated in trainings regarding sex crimes, including sex trafficking, as well as intelligence gathering, and also learned these skills on the job. Based on my experience and training as a Vice Unit officer, I have been qualified as an expert in court proceeding regarding the field of human trafficking.

6. In my experience as a Vice Unit officer, sex trafficking commonly occurs in hotels. Law enforcement relies heavily on hotel owners to monitor their own properties and pay attention to what is occurring on site. Hotel staff have firsthand access to areas and situations that police officers do not, including more opportunities to observe guests who may appear young or vulnerable and enter rooms during routine cleaning and maintenance.

7. I am familiar with the Masters Inn located at 1435 Montreal Road in Tucker, Georgia. During my time with the Vice Unit, I responded to calls and complaints of criminal activity and conducted undercover investigations at the

Masters Inn. In my experience, commercial sex activity was common at Masters Inn and a problem for law enforcement.

8. Most of the commercial sex activity was inside and further away from the Masters Inn office. In my experience, this is a typical practice for hotels who are aware of commercial sex activity but try to keep such activity in an area that is less likely to be observed. This location also provides a better lookout than other areas of the hotel.

9. Based on what I observed at the Masters Inn, the signs of commercial sex crimes (like prostitution and sex trafficking) were common and obvious to Masters Inn staff. To my knowledge, the hotel did nothing to stop or prevent these sex crimes.

10. Women who were being sold for sex informed me that hotel staff warned or tipped off the pimps (traffickers) when law enforcement were at or approaching the Masters Inn.

11. I also personally observed activity at the hotel demonstrating that people were being warned or tipped off when police were present. During undercover operations, members of my team would park nearby or in the parking lot in an unmarked vehicle. While inside the unmarked vehicle I observed people moving about the hotel with open curtains or visible on balconies. But as soon as myself or other officers in uniform exited the vehicles, I would observe signs

of people scattering like they were tipped off. I observed people close curtains, people on balconies go inside, or otherwise conceal themselves inside the hotel.

12. After securing the rooms and any persons during an operation, I would speak with hotel staff. Typically, the staff were not immediately forthcoming about the commercial sex activity on the property. I would inform hotel staff to call me if they saw signs of sex trafficking or observed young looking women who were being sold for sex. To my recollection I never received a call about such activity from anyone at the Masters Inn.

13. On one occasion, I interviewed a women suspected of prostitution at the Masters Inn. Following MATCH protocol, I asked questions including whether any hotel employees were involved in the commercial sex activity. One of the suspected prostitutes confirmed that hotel staff had slept with a prostitute on at least one occasion.

14. Based upon my investigation, observations, training, and experience as a police officer and with the Masters Inn, I concluded that employees at the hotel were warning pimps when the cops were at the hotel.

15. Over the course of many years responding to calls and supervising undercover operations at the Masters Inn, I personally observed at least two minors who were being sold for sex at the Masters Inn.

16. I have read this Declaration consisting of 16 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on February 6, 2026.

Signed by:
Hubert L. Brannon
7BA5694A7BB141E...

Hubert L. Brannon

# Exhibit 7

Calvin D. King Declaration

# DECLARATION OF CALVIN D. KING

Calvin D. King, pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is Calvin D. King. I am more than twenty-one years of age, competent to testify, have no legal or mental disability and have personal knowledge of the facts stated herein. I freely give this declaration for use in this case. This declaration was executed in the state of Georgia, where I am currently located.

2. I have worked in law enforcement for over eighteen years. I am currently a Lieutenant with the Henry County Sheriff's Office. Prior to that, I worked for the Dekalb County Police Department from 2008 to 2021.

3. Beginning in 2015, I served as the lead detective in the Dekalb County Vice Unit, which was also part of the FBI's Metro Atlanta Child Exploitation ("MATCH") Task force. In that role, I worked in coordination with the FBI and was issued FBI task force credentials.

4. The Vice Unit was responsible for investigating vice crimes (e.g., drugs, prostitution, human trafficking) in Dekalb County and throughout the metro Atlanta area. I worked on over one hundred investigations relating to vice crimes, including drugs, prostitution, and human trafficking.

5. Before my assignment to the Vice Unit, I worked for four years on the Neighborhood Enforcement Team ("NET") Task Force, which focused on proactive law enforcement efforts in high-crime areas.

6. Before my work on the NET Task Force, I served as a patrol officer.

7. A history of my training and certifications is attached hereto as Exhibit A.

8. Since at least 2013, I have participated in numerous trainings regarding sex crimes, including sex trafficking.

9. In my experience, sex trafficking most commonly occurs in hotels. Hotels are used because they provide privacy and make it easier for traffickers to operate without drawing attention from law enforcement. I estimate that 85 percent of the prostitution and sex trafficking crimes I investigated involved hotels.

10. Traffickers are criminals. Traffickers choose hotels where they believe they can operate without getting caught by law enforcement. There are several reasons that make a hotel attractive to traffickers, including hotels with high crime, lax management or management that rents rooms to anyone who will pay, regardless of their activities (e.g., sex trafficking, prostitution, drugs), low staffing, easy access to the interstate, and little or no security presence, among others.

11. Law enforcement rely heavily on hotel owners to monitor their own properties and pay attention to what is occurring on site. Hotel staff have firsthand access

to areas and situations that police officers do not, including more opportunities to observe guests who may appear young or vulnerable and entering rooms during routine cleaning and maintenance.

12. The signs of commercial sex crimes like prostitution and sex trafficking are not difficult to identify. Some basic signs include frequent foot traffic to and from the same room over a short period of time, girls and women loitering in provocative clothing in common areas throughout the day and night, one person renting two or more rooms for a long period of time but paying for those rooms each day in cash, and rooms with drugs and sex paraphernalia.

13. An active commercial sex operation at a hotel is the biggest single red flag for sex trafficking. Allowing any kind of commercial sex on the property runs the risk that a person under the age of 18 is being sold for sex.

14. While working for the NET Task Force, and later the Vice Unit, one of my responsibilities was to be familiar with hotels in Dekalb County and in metro Atlanta with high crime rates and high rates of vice crime.

15. In the course of carrying out those responsibilities, I visited and became familiar with the Masters Inn located at 1435 Montreal Rd, Tucker, Georgia 30084.

16. Drug and commercial sex were common at Masters Inn. It was a hotspot for drug and commercial sex crimes.

17. Compared to other hotels in DeKalb County, Masters Inn was a problem hotel with a high rate of drug and commercial sex crimes occurring there regularly.

18. At any given point in time, based on my observations and experience, as many as 20 women or girls were engaged in commercial sex acts at the Masters Inn.

19. When a hotel had ongoing criminal activity, including sex trafficking or prostitution, we offered to meet with the owners to explain steps they could take to help prevent human trafficking. These steps included training employees to recognize signs that someone might be underage but more importantly to call the police anytime an employee observes activity on the property that does not seem right. To my knowledge, Masters Inn never requested such training.

20. It was common knowledge amongst all the hotel owners in Dekalb County that they could hire off-duty police officers as security at the hotel. To my knowledge, Masters Inn never hired any off-duty police officers or had any security officers at all.

21. Based on what I saw and experienced, the signs of commercial sex crimes (like prostitution and sex trafficking) at Masters Inn were common sense and apparent to Masters Inn staff. To my knowledge, the hotel did nothing to stop or prevent these sex crimes. Instead, it appeared that Masters Inn continued renting rooms to those involved and allowed the activity to continue.

22. I have read this Declaration consisting of 22 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on January 28, 2026.

Signed by:
CD King
8AE142EBACA345F...

Calvin D. King

# EXHIBIT A

State of Georgia

**Peace Officer Standards and Training Council**

Network Data Gateway



# Data Report System

## Individual Officer Profile

*Created: 02-06-2025 02:10*

*Requested by: Jill Perry*

O145356

| | |
|---|---|
| Officer Key | **O145356** |
| Officer Name | **CALVIN D KING JR** |
| Race | **Black or African American (Not Hispanic or Latino)** |
| Education | **High School Diploma** |
| Status | **In Good Standing** |

## Officer Certifications

| Certification | Description | Certification Type | Status |
|---|---|---|---|
| PA0120180096S | INTERMEDIATE CERTIFICATE | Career Development | Active |
| PS16110078S | LIDAR (LASER) OPERATOR | Specialized | Active |
| PBLE090986S | BASIC LAW ENFORCEMENT | Basic | Active |
| PBJA081321S | JAILER | Basic | Active |
| PBCO080316S | CORRECTIONS OFFICER | Basic | Active |

## Instructor Certifications

None Found

## Employment History

| Agency | Rank | Start Date | End Date | Status |
|---|---|---|---|---|
| HENRY COUNTY SHERIFF'S OFFICE | Lieutenant | June 10, 2024 | | Actively Employed in Law Enforcement |
| HENRY COUNTY SHERIFF'S OFFICE | Sergeant | July 25, 2022 | June 9, 2024 | Rank Change - Promotion |
| HENRY COUNTY SHERIFF'S OFFICE | Deputy Sheriff | October 18, 2021 | July 24, 2022 | Rank Change - Promotion |
| DEKALB COUNTY POLICE DEPARTMENT | Peace Officer | December 1, 2008 | October 13, 2021 | Voluntary Resignation |
| DEKALB COUNTY SHERIFFS OFFICE | Jail Officer | June 2, 2008 | November 28, 2008 | Voluntary Resignation |
| GEORGIA DIAGNOSTIC CLASSIFICATION PRISON | Corrections Officer | November 1, 2007 | May 31, 2008 | Voluntary Resignation |

## Sanctions

None Found

## Investigations

None Found

## Training History

| Date | Number | Course | Hours |
|---|---|---|---|
| January 31, 2025 | IFM22F | USE OF DEADLY FORCE | 2 |
| January 31, 2025 | ICR02G | DE-ESCALATION TECHNIQUES | 2 |
| January 31, 2025 | IFM19F | FIREARMS STRESS COURSE | 5 |



*Requestor IP Address: 73.82.123.65*

| | | | |
|---|---|---|---|
| January 31, 2025 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| January 22, 2025 | DYE11G | Cultural Adeptness in Law Enforcement | 1 |
| January 22, 2025 | DYE00G | CULTURAL AWARENESS (Gov. Initiative) | 2 |
| January 22, 2025 | DYM11G | DE-ESCALATION OPTIONS FOR GAINING COMPLIANCE (GPSTC)(r.2020) | 3 |
| January 11, 2025 | DBM23G | Human Trafficking and the Commercial Sexual Exploitation of Children (2 hr)(new 2024) | 2 |
| January 11, 2025 | DGA04G | Gang Awareness (GPSTC-Governor's Initiative) | 1 |
| January 8, 2025 | IBM31G | INTELLIGENCE GATHERING | 1 |
| | | | 2025 Total Hours : 20 |
| December 5, 2024 | IFM33G | BEAN BAG MUNITIONS | 1 |
| November 27, 2024 | IFM33G | BEAN BAG MUNITIONS | 1 |
| October 31, 2024 | ILU00G | Legal Update | 1 |
| October 9, 2024 | UFL01F | PATROL RIFLE QUALIFICATION | 1 |
| October 9, 2024 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| October 1, 2024 | IFD04G | BARRICADED SUBJECTS | 4 |
| September 17, 2024 | IDG16G | TASER RECERTIFICATION | 2 |
| August 14, 2024 | DGB01G | CJIS Security Policy Awareness and Training/Awareness Statement | 1 |
| July 31, 2024 | IGB30G | CJIS NETWORK OPERATOR TRAINING | 5 |
| July 19, 2024 | IFM30F | MARKSMANSHIP SKILLS | 4 |
| July 17, 2024 | IGS10G | COMMUNITY POLICING | 2 |
| July 17, 2024 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| July 12, 2024 | IFM62F | TACTICAL HANDGUN TRAINING | 4 |
| July 11, 2024 | IBJ01G | ELECTRONIC SURVEILLANCE | 8 |
| July 1, 2024 | IQM06G | Promotion Training - Henry County SO | 1 |
| June 27, 2024 | IGS09G | COMMUNITY POLICING (BIASED BASED) | 2 |
| May 24, 2024 | IFM00F | FIREARMS TRAINING (NOT REQUALIFICATION) | 1 |
| May 24, 2024 | IFL00F | LONG GUN/RIFLE | 1 |
| April 19, 2024 | UFM01F | BACK-UP WEAPON QUALIFICATION | 1 |
| April 19, 2024 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| March 18, 2024 | IFM00F | FIREARMS TRAINING (NOT REQUALIFICATION) | 2 |
| March 4, 2024 | IEL00E | CPR with AED | 2 |
| February 14, 2024 | IFM22F | USE OF DEADLY FORCE | 2 |
| January 10, 2024 | IDG16G | TASER RECERTIFICATION | 2 |
| January 9, 2024 | NBO16G | International Association of Human Trafficking Investigators Conference | 16 |
| January 4, 2024 | DBM12G | Human Trafficking (GPSTC) | 2 |
| January 4, 2024 | DBO03G | INTRODUCTION TO GANGS IN GA (GPSTC) 3 hr version | 3 |
| | | | 2024 Total Hours : 72 |
| December 28, 2023 | IDG16G | TASER RECERTIFICATION | 2 |
| December 5, 2023 | IDM33D | Less Lethal Shotgun | 8 |
| December 1, 2023 | IDO07G | Pepperball Operator Course | 8 |
| November 30, 2023 | ICR12G | Civil Disturbance | 32 |
| November 17, 2023 | IEM20G | GA Access to Medical Cannabis | 1 |
| October 18, 2023 | SQL01G | Leadership in Public Safety: Theory and Practice (GPSTC) | 76 |
| October 5, 2023 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| September 25, 2023 | IDA01G | ASP BATON RECERTIFICATION | 1 |
| September 25, 2023 | IDO02D | OLEORESIN CAPSICUM (RE-FAMILIARIZATION) | 1 |
| September 5, 2023 | IBF03G | LIVESCAN FINGERPRINT SYSTEM | 3 |
| August 29, 2023 | DGB01G | CJIS Security Policy Awareness and Training/Awareness Statement | 2 |



*Requestor IP Address: 73.82.123.65*

| | | | |
|---|---|---|---|
| August 25, 2023 | IDT01G | BUILDING CLEARINGS | 3 |
| August 22, 2023 | IGA00G | GANGS | 2 |
| August 21, 2023 | IHM20G | NIMS: IS-100 INTRO TO ICS | 2 |
| August 21, 2023 | IHM21G | NIMS: IS-200 BASIC ICS | 4 |
| August 21, 2023 | IHM24G | NIMS: IS-700 NIMS INTRO COURSE | 3 |
| August 21, 2023 | IHM25G | NIMS: IS-800 NAT. RESPONSE PLAN | 3 |
| August 2, 2023 | IQM00G | MISC. SUPERVISORY/MANAGEMENT SKILLS | 2 |
| July 26, 2023 | IDJ00D | HANDCUFFING TECHNIQUES (DEF TACTICS INSTRUCTOR) | 2 |
| June 6, 2023 | IGK00G | ETHICS AND PROFESSIONALISM | 2 |
| May 31, 2023 | IQM26G | RISK MGMT FOR L.E. | 2 |
| May 26, 2023 | IDT03G | BUILDING SEARCHS | 6 |
| May 18, 2023 | IFM10F | BARRICADE SHOOTING TECHNIQUES | 2 |
| May 18, 2023 | IFM00F | FIREARMS TRAINING (NOT REQUALIFICATION) | 1 |
| May 10, 2023 | IDT01G | BUILDING CLEARINGS | 3 |
| May 2, 2023 | ITC00G | CRIMES IN PROGRESS | 2 |
| April 30, 2023 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| April 30, 2023 | IFM22G | USE OF DEADLY FORCE | 1 |
| April 30, 2023 | IGS10G | COMMUNITY POLICING | 2 |
| April 21, 2023 | NBM70G | MANTRACKER PUBLIC SAFETY TRAINING CONFERENCE | 4 |
| April 17, 2023 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| April 17, 2023 | UFL01F | PATROL RIFLE QUALIFICATION | 1 |
| April 14, 2023 | IXM18G | NARCAN | 2 |
| March 31, 2023 | IES10G | HELICOPTER SAFETY | 4 |
| March 22, 2023 | IQL00G | LEADERSHIP | 8 |
| March 10, 2023 | IDG04G | TASER SIMULATOR TRAINING | 2 |
| March 2, 2023 | ILC05G | ELEMENTS OF ARREST | 2 |
| February 20, 2023 | IFD27G | VEHICLE ASSAULTS | 4 |
| February 8, 2023 | IEM00E | MISCELLANEOUS EMERGENCY MEDICAL | 2 |
| February 6, 2023 | IQS00G | SUPERVISION | 2 |
| January 27, 2023 | IBS00G | SEX CRIMES INVESTIGATION | 2 |
| January 25, 2023 | IHQ21G | MASS CASUALTY INCIDENTS | 3 |
| January 24, 2023 | IHT00G | FIRE SAFETY TRAINING | 2 |
| January 10, 2023 | ICC01G | SUICIDE PREVENTION | 4 |
| | | | 2023 Total Hours : 221 |

| | | | |
|---|---|---|---|
| October 29, 2022 | NGM03G | NOBLE ANNUAL CONFERENCE | 2 |
| October 29, 2022 | NCP08G | DE-ESCALATION TRAINING (GOV. INITIATIVE) | 1 |
| October 29, 2022 | NDU04G | Use of Force Training for Gov. Initiative Credit | 1 |
| October 28, 2022 | NGM03G | NOBLE ANNUAL CONFERENCE | 8 |
| October 14, 2022 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| October 3, 2022 | IHT00G | FIRE SAFETY TRAINING | 1 |
| September 29, 2022 | IFD00F | SWAT TRAINING | 8 |
| September 23, 2022 | IDT01G | BUILDING CLEARINGS | 5 |
| September 22, 2022 | IGB30G | CJIS NETWORK OPERATOR TRAINING | 5 |
| September 22, 2022 | DGB01G | GCIC SECURITY AWARENESS TRAINING | 1 |
| September 19, 2022 | IEM00E | MISCELLANEOUS EMERGENCY MEDICAL | 2 |
| August 29, 2022 | IFM60G | Flying While Armed (GPSTC) | 2 |
| August 26, 2022 | IDT01G | BUILDING CLEARINGS | 8 |
| July 21, 2022 | IFM17F | ADVANCED TACTICAL MARKSMANSHIP | 6 |



*Requestor IP Address: 73.82.123.65*

| | | | |
|---|---|---|---|
| July 18, 2022 | DSD02G | Essentials of Law Enforcement Driving (GPSTC) 2022 | 4 |
| July 13, 2022 | IBF03G | LIVESCAN FINGERPRINT SYSTEM | 1 |
| June 30, 2022 | IDJ00G | HANDCUFFING TECHNIQUES (GENERAL INSTRUCTOR) | 1 |
| June 30, 2022 | IJC01G | SEARCH TECHNIQUES | 1 |
| June 30, 2022 | IFM22F | USE OF DEADLY FORCE | 2 |
| May 27, 2022 | IGW01G | MENTAL HEALTH | 2 |
| May 3, 2022 | IEM15E | State Opioid Adapted Response (SOAR) | 4 |
| April 28, 2022 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| April 28, 2022 | UFL01F | PATROL RIFLE QUALIFICATION | 1 |
| April 14, 2022 | ICP05G | P4 De-escalation Jiu Jitsu | 24 |
| April 4, 2022 | ICR02G | DE-ESCALATION TECHNIQUES | 2 |
| April 4, 2022 | IYR01G | USE OF FORCE REPORTS | 1 |
| April 4, 2022 | IFJ04G | JUDGEMENTAL SIMULATOR TRAINING | 2 |
| April 4, 2022 | IGS10G | COMMUNITY POLICING | 2 |
| April 4, 2022 | ILU00G | Legal Update | 1 |
| March 25, 2022 | DGB01G | GCIC SECURITY AWARENESS TRAINING | 1 |
| February 25, 2022 | IDE01G | DIGNITARY PROTECTION | 40 |
| February 3, 2022 | IFD27G | VEHICLE ASSAULTS | 4 |
| February 3, 2022 | IFD12F | HALLWAY CLEARING TECHNIQUES | 4 |
| January 11, 2022 | IDG16G | TASER RECERTIFICATION | 2 |
| | | | 2022 Total Hours : 154 |

| | | | |
|---|---|---|---|
| December 30, 2021 | IFJ04G | JUDGEMENTAL SIMULATOR TRAINING | 2 |
| December 3, 2021 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| November 19, 2021 | DYM10G | POLICE LEGITIMACY, PROCEDURAL JUSTICE, & COMMUNITY RELATIONS (Gov. Initiative) (4 HR) | 4 |
| November 18, 2021 | DBI04G | EYEWITNESS IDENTIFICATION (GPSTC ONLINE) | 1 |
| November 18, 2021 | DYE10G | Building Positive Police-Community Relations (Gov. Initiative) | 4 |
| November 18, 2021 | DYP03G | Police-Press Relations During Events of Public Interest | 3 |
| November 18, 2021 | DBM12G | Human Trafficking (GPSTC) | 2 |
| November 18, 2021 | DYJ05G | Effective Workplace Communication (GPSTC) | 1 |
| November 18, 2021 | DBO03G | INTRODUCTION TO GANGS IN GA (GPSTC) 3 hr version | 3 |
| November 18, 2021 | DHQ01G | SOVEREIGN CITIZEN MOVEMENT (GPSTC ONLINE) | 1 |
| November 18, 2021 | DXM06G | Fundamentals of Drug Identification (GPSTC) | 1 |
| November 18, 2021 | DJM05G | TRANSPORTING PRISONERS (GPSTC ONLINE) (Rev. 2021) | 2 |
| November 17, 2021 | DTU02G | VEHICLE PULLOVERS (GPSTC ONLINE) 2 hr. version | 2 |
| November 3, 2021 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| November 3, 2021 | IFL05F | PATROL RIFLE TRAINING | 24 |
| October 29, 2021 | DLU21G | LEGISLATIVE & CASE LAW UPDATE 2021 (GPSTC ONLINE) | 1 |
| October 19, 2021 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| October 5, 2021 | IDG22G | TASER 7 Transition Course | 10 |
| October 4, 2021 | IDA02G | EXPANDABLE BATON INSERVICE | 2 |
| October 4, 2021 | IHQ46G | CRITICAL INCIDENT COMMAND | 5 |
| October 4, 2021 | IFM22G | USE OF DEADLY FORCE | 2 |
| April 26, 2021 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| April 26, 2021 | IGW01G | MENTAL HEALTH | 2 |
| April 26, 2021 | IBN01G | EVIDENCE AND PROPERTY MANAGEMENT | 1 |
| April 26, 2021 | ICM02G | TEMPORARY PROTECTIVE ORDERS | 1 |
| April 26, 2021 | IYR06G | INCIDENT REPORT UPDATE TRAINING | 1 |



*Requestor IP Address: 73.82.123.65*

| | | | |
|---|---|---|---|
| April 26, 2021 | IGS10G | COMMUNITY POLICING | 2 |
| April 26, 2021 | IZM10G | CANINE PROTOCOLS | 1 |
| April 5, 2021 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| February 2, 2021 | ISD11G | Nat. Safety Council Defensive Driving (General Instructor) | 8 |
| | | | 2021 Total Hours : 94 |

| | | | |
|---|---|---|---|
| December 30, 2020 | DLL03G | Duty to Intervene | 4 |
| October 7, 2020 | DGB01G | GCIC SECURITY AWARENESS TRAINING | 1 |
| October 7, 2020 | IGB31G | CJIS NETWORK OPERATOR RE-CERTIFICATION EXAM | 1 |
| September 1, 2020 | IDA02G | EXPANDABLE BATON INSERVICE | 2 |
| September 1, 2020 | IDG06G | TASER X-26 | 2 |
| September 1, 2020 | ITU06G | HIGH RISK TRAFFIC STOPS | 3 |
| September 1, 2020 | IWD05G | DUI UPDATE | 2 |
| August 28, 2020 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| May 7, 2020 | DLV05G | USE OF FORCE (GPSTC) (G.I.) (R.2020) | 6 |
| April 22, 2020 | DYM11G | DE-ESCALATION OPTIONS FOR GAINING COMPLIANCE (GPSTC)(r.2020) | 3 |
| March 25, 2020 | DYM00G | POLICE LEGITIMACY, PROCEDURAL JUSTICE, & COMMUNITY RELATIONS (Gov. Initiative) | 2 |
| March 24, 2020 | DYM04G | MENTAL & EMOTIONAL WELLNESS (GPSTC) | 2 |
| | | | 2020 Total Hours : 29 |

| | | | |
|---|---|---|---|
| December 19, 2019 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| October 9, 2019 | NHE01G | CRITICAL INCIDENT MANAGEMENT | 14 |
| June 10, 2019 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| March 27, 2019 | IDA02G | EXPANDABLE BATON INSERVICE | 2 |
| March 27, 2019 | IDG06G | TASER X-26 | 2 |
| March 27, 2019 | IAA01G | CAREER DEVELOPMENT PROGRAM OVERVIEW | 1 |
| March 27, 2019 | IGS10G | COMMUNITY POLICING | 2 |
| March 27, 2019 | ICR02G | DE-ESCALATION TECHNIQUES | 2 |
| March 27, 2019 | IFD18G | RESPONSE TO THE ACTIVE SHOOTER | 9 |
| February 12, 2019 | ISD11G | Nat. Safety Council Defensive Driving (General Instructor) | 8 |
| January 31, 2019 | IFM22G | USE OF DEADLY FORCE | 1 |
| | | | 2019 Total Hours : 43 |

| | | | |
|---|---|---|---|
| December 17, 2018 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| November 13, 2018 | DGB01G | GCIC SECURITY AWARENESS TRAINING | 1 |
| November 13, 2018 | IGB31G | CJIS NETWORK OPERATOR RE-CERTIFICATION EXAM | 1 |
| September 10, 2018 | NBO06G | HUMAN TRAFFICKING & GANG ACTIVITY SYMPOSIUM (GPSTC) | 8 |
| June 26, 2018 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| May 7, 2018 | CAL02G | ADVANCED REPORT WRITING | 16 |
| May 1, 2018 | IDS00G | OFFICER SURVIVAL | 4 |
| May 1, 2018 | IYR00G | REPORT WRITING | 2 |
| May 1, 2018 | IDA02G | EXPANDABLE BATON INSERVICE | 1 |
| May 1, 2018 | IDG06G | TASER X-26 | 2 |
| April 30, 2018 | IGS10G | COMMUNITY POLICING | 8 |
| April 30, 2018 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| February 15, 2018 | NYS02G | SPANISH | 22 |
| January 17, 2018 | IFM22G | USE OF DEADLY FORCE | 1 |
| | | | 2018 Total Hours : 69 |



*Requestor IP Address: 73.82.123.65*

| | | | |
|---|---|---|---|
| December 22, 2017 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| October 20, 2017 | CAG02G | CRIME SCENE PROCESSING | 24 |
| September 28, 2017 | CAE01G | OFFICER SURVIVAL | 40 |
| August 17, 2017 | IGS10G | COMMUNITY POLICING | 2 |
| August 17, 2017 | IDA02G | EXPANDABLE BATON INSERVICE | 1 |
| August 17, 2017 | IDG06G | TASER X-26 | 2 |
| August 17, 2017 | IDS00G | OFFICER SURVIVAL | 4 |
| August 16, 2017 | NGW08G | YOUTH MENTAL HEALTH FIRST AID | 8 |
| August 16, 2017 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| July 20, 2017 | NSD02G | DEFENSIVE DRIVING/NAT. SAFETY COUNCL | 8 |
| June 29, 2017 | CAB01G | HEALTH AND WELLNESS AWARENESS | 22 |
| June 20, 2017 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| June 16, 2017 | CAD01E | FIRST RESPONDER | 40 |
| May 11, 2017 | CAA01G | CRIMINAL PROCEDURE | 40 |
| April 27, 2017 | ICD07G | ELDER AND DEPENDENT ABUSE | 8 |
| February 2, 2017 | CAI02G | INTERVIEWS AND INTERROGATIONS | 24 |
| January 31, 2017 | IFM22G | USE OF DEADLY FORCE | 1 |
| January 30, 2017 | IBM59G | HUMAN TRAFFICKING | 4 |
| January 18, 2017 | NGK00G | ETHICS | 1 |
| | | | 2017 Total Hours : 232 |

| | | | |
|---|---|---|---|
| December 16, 2016 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| December 14, 2016 | NGM00G | SEMINAR - LE RELATED TRAINING | 4 |
| December 6, 2016 | IGB30G | CJIS NETWORK OPERATOR TRAINING | 5 |
| December 6, 2016 | DGB01G | GCIC SECURITY AWARENESS TRAINING | 1 |
| November 18, 2016 | AGW01G | CRISIS INTERVENTION TEAM TRAINING | 40 |
| September 30, 2016 | IFM22G | USE OF DEADLY FORCE | 1 |
| June 16, 2016 | CAD01E | FIRST RESPONDER | 40 |
| June 7, 2016 | NBC62G | CHILD ABDUCTION REACTION | 16 |
| May 19, 2016 | ILG00G | GEORGIA CRIMINAL LAW | 3 |
| May 5, 2016 | AKV02G | A.L.E.R.R.T. Terrorism Response Tactics Active Shooter Level 1 | 16 |
| May 5, 2016 | IDA02G | EXPANDABLE BATON INSERVICE | 1 |
| May 5, 2016 | IDG06G | TASER X-26 | 1 |
| May 4, 2016 | IFM22G | USE OF DEADLY FORCE | 1 |
| April 29, 2016 | CAC01G | INTERPERSONAL RELATIONS/CRISIS | 8 |
| March 29, 2016 | UFR00F | FIREARMS REQUALIFICATIONS | 4 |
| | | | 2016 Total Hours : 142 |

| | | | |
|---|---|---|---|
| December 8, 2015 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| June 18, 2015 | NSD02G | DEFENSIVE DRIVING/NAT. SAFETY COUNCL | 8 |
| June 11, 2015 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| March 12, 2015 | IDD00D | DEFENSIVE TACTICS | 4 |
| March 12, 2015 | IGW05G | MENTAL ILLNESS-OFFICER'S RESPONSE TO | 1 |
| March 12, 2015 | IZA02G | ANIMAL ENCOUNTERS & L.E. RESPONSE | 2 |
| March 12, 2015 | IFM22G | USE OF DEADLY FORCE | 1 |
| March 11, 2015 | DLF01G | WORKPLACE HARASSMENT (REINHARDT ONLINE) | 2 |
| March 11, 2015 | ILF01G | SEXUAL HARASSMENT | 3 |
| March 11, 2015 | ILG00G | GEORGIA CRIMINAL LAW | 1 |
| March 11, 2015 | IDA02G | EXPANDABLE BATON INSERVICE | 1 |

| | | | |
|---|---|---|---|
| March 11, 2015 | IDG06G | TASER X-26 | 3 |
| March 11, 2015 | ICD00G | DOMESTIC VIOLENCE | 2 |
| February 27, 2015 | AXU01G | DRUG UNDERCOVER OPERATIONS | 40 |
| January 20, 2015 | CAJ02G | SEARCH WARRANTS AND AFFIDAVITS | 16 |
| January 13, 2015 | IGB30G | CJIS NETWORK OPERATOR TRAINING | 5 |
| January 13, 2015 | IGB13G | SECURITY AND INTEGRITY OF CHRI (4 HR) | 4 |
| | | | 2015 Total Hours : 95 |
| November 5, 2014 | IDG06G | TASER X-26 | 4 |
| September 2, 2014 | UFR00F | FIREARMS REQUALIFICATIONS | 8 |
| June 23, 2014 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| April 10, 2014 | NQM17G | FINANCIAL PLANNING | 3 |
| April 10, 2014 | IAB00G | HEALTH, WELLNESS, & PHYSICAL FITNESS | 2 |
| April 10, 2014 | IDA02G | EXPANDABLE BATON INSERVICE | 2 |
| April 10, 2014 | IDG16G | TASER RECERTIFICATION | 2 |
| April 10, 2014 | ICC05G | CRISIS INTERVENTION SKILLS | 3 |
| April 10, 2014 | IFM22G | USE OF DEADLY FORCE | 1 |
| April 10, 2014 | IDD07D | DEFENSIVE TACTICS | 2 |
| April 10, 2014 | ILQ00G | SEARCH AND SEIZURE | 2 |
| April 10, 2014 | IGK00G | ETHICS AND PROFESSIONALISM | 1 |
| | | | 2014 Total Hours : 31 |
| December 19, 2013 | NSD02G | DEFENSIVE DRIVING/NAT. SAFETY COUNCL | 8 |
| December 16, 2013 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| October 23, 2013 | ITQ03G | BICYCLE PATROL | 30 |
| June 25, 2013 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| April 19, 2013 | IDA02G | EXPANDABLE BATON INSERVICE | 2 |
| April 19, 2013 | IDG16G | TASER RECERTIFICATION | 3 |
| April 19, 2013 | IDD07D | DEFENSIVE TACTICS | 3 |
| April 19, 2013 | IFM22F | USE OF DEADLY FORCE | 1 |
| April 18, 2013 | IBM59G | HUMAN TRAFFICKING | 2 |
| April 18, 2013 | IAB00G | HEALTH, WELLNESS, & PHYSICAL FITNESS | 2 |
| April 18, 2013 | ILM12G | LEGAL ISSUES | 1 |
| April 18, 2013 | ILQ00G | SEARCH AND SEIZURE | 2 |
| April 18, 2013 | ICD00G | DOMESTIC VIOLENCE | 2 |
| March 28, 2013 | IFL03F | PATROL RIFLE | 40 |
| March 25, 2013 | IFM22G | USE OF DEADLY FORCE | 1 |
| February 13, 2013 | IGB13G | SECURITY AND INTEGRITY OF CHRI | 4 |
| February 13, 2013 | IGB21G | GCIC INQUIRY TERMINAL OPERATOR RECERTIFICATION | 3 |
| January 9, 2013 | NXM33G | DRUG COURT SEMINAR | 8 |
| | | | 2013 Total Hours : 114 |
| December 10, 2012 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| August 8, 2012 | IHQ05G | HOMELAND SECURITY | 3 |
| August 8, 2012 | ICD05G | ELDER ABUSE | 1 |
| August 8, 2012 | IDA02D | EXPANDABLE BATON INSERVICE | 2 |
| August 8, 2012 | IDG16G | TASER RECERTIFICATION | 1 |
| August 8, 2012 | ITI06G | ACCIDENT SCENE SAFETY | 1 |
| August 8, 2012 | IFM22G | USE OF DEADLY FORCE | 1 |



*Requestor IP Address: 73.82.123.65*

| | | | |
|---|---|---|---|
| August 8, 2012 | ITU02G | FELONY TRAFFIC STOPS | 2 |
| August 8, 2012 | IGK00G | ETHICS AND PROFESSIONALISM | 1 |
| August 8, 2012 | IKV12G | ACTIVE SHOOTER RESPONSE | 6 |
| June 26, 2012 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| | | | 2012 Total Hours : 20 |
| December 6, 2011 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| June 30, 2011 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| May 17, 2011 | IFM22G | USE OF DEADLY FORCE | 1 |
| May 17, 2011 | IDD07D | DEFENSIVE TACTICS | 5 |
| May 17, 2011 | IDA01G | ASP BATON RECERTIFICATION | 1 |
| May 17, 2011 | NOG14G | TASER RECERTIFICATION | 2 |
| May 16, 2011 | NGW03G | MENTAL ILLNESS | 1 |
| May 16, 2011 | NSD02G | DEFENSIVE DRIVING/NAT. SAFETY COUNCL | 8 |
| March 29, 2011 | NOC38G | GCIC SECURITY & INTEGRITY | 4 |
| March 29, 2011 | AGB08G | TERMINAL OPERATOR INQUIRY CERT. | 18 |
| March 2, 2011 | CAH02G | SPECIALIZED PATROL TECHNIQUES | 16 |
| February 28, 2011 | CAF02G | ADVANCED TRAFFIC LAW | 24 |
| | | | 2011 Total Hours : 82 |
| October 27, 2010 | IFS02F | SEMIAUTO PISTOL TRANSITION (W/minimum 1 Hr FA REQUAL) | 18 |
| October 13, 2010 | ICD05G | ELDER ABUSE | 1 |
| October 13, 2010 | IDG02G | TASER | 3 |
| October 13, 2010 | ITM07G | STOP STICK TRAINING | 2 |
| October 13, 2010 | IFM22F | USE OF DEADLY FORCE | 1 |
| October 13, 2010 | IDA01G | ASP BATON RECERTIFICATION | 1 |
| October 13, 2010 | NOD37G | INTERNAL AFFAIRS UPDATE | 1 |
| July 13, 2010 | ATL01R | LIDAR SPEED MEASUREMENT | 8 |
| June 30, 2010 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| June 28, 2010 | ISD01T | DRIVER TRAINING | 7 |
| | | | 2010 Total Hours : 43 |
| December 31, 2009 | PAV14G | GRADUATED AFTER APRIL 1-NO WAIVER NECESSARY | 0 |
| December 31, 2009 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| December 1, 2009 | ASD02T | DEFENSIVE DRIVING | 8 |
| December 1, 2009 | UDP06G | EXPANDABLE BATON RECERTIFICATION | 1 |
| November 30, 2009 | IDG06G | TASER X-26 | 9 |
| May 29, 2009 | BMS05G | DEKALB CO. P.D. EXTENDED BASIC | 401 |
| May 29, 2009 | CAE01G | OFFICER SURVIVAL (rev. 2023) | 40 |
| May 29, 2009 | CAA01G | CRIMINAL PROCEDURE | 40 |
| May 29, 2009 | CAC01G | INTERPERSONAL RELATIONS/CRISIS | 8 |
| May 29, 2009 | BML06G | BASIC LAW ENFORCEMENT TRAINING CRS. | 409 |
| April 22, 2009 | NSD02G | DEFENSIVE DRIVING/NAT. SAFETY COUNCL | 8 |
| April 10, 2009 | AGB02G | SECURITY & INTEGRITY OF CJ INFORMATI | 4 |
| April 10, 2009 | AGB13G | TERMINAL OPERATOR CERTIFICATION | 35 |
| | | | 2009 Total Hours : 964 |
| December 31, 2008 | PAV12T | FA REQUAL/UODF AVG 2 HRS PER MOS WAIVER | 20 |
| July 3, 2008 | IJO00G | JAIL OPERATIONS | 120 |



*Requestor IP Address: 73.82.123.65*

| | | | |
|---|---|---|---|
| June 23, 2008 | BMH01G | BASIC JAIL TRAINING COURSE | 80 |

2008 Total Hours : 220

| | | | |
|---|---|---|---|
| December 31, 2007 | PAV95T | 20 HR/FA/UODF 3 MONTH WAIVER | 20 |
| December 20, 2007 | BMC99G | BASIC D.O.C. SECURITY TRAINING | 200 |
| November 20, 2007 | NOC01F | FIREARMS RIFLE CERT | 4 |

2007 Total Hours : 224

Summary of Hours for 19 Years

| Year | Total Hours | Firearms | Deadly Force | De-escalation | Community Policing | Gang Awareness | Human Trafficking |
|---|---|---|---|---|---|---|---|
| 2025 | 20 | 1 | 1 | 2 | 3 | 1 | 2 |
| 2024 | 72 | 2 | 1 | 1 | 2 | 4 | 3 |
| 2023 | 221 | 2 | 1 | 1 | 2 | 1 | 1 |
| 2022 | 154 | 1 | 2 | 3 | 4 | 1 | 1 |
| 2021 | 94 | 3 | 1 | 1 | 6 | 4 | 3 |
| 2020 | 29 | 1 | 1 | 1 | 4 | 0 | 0 |
| 2019 | 43 | 2 | 1 | 1 | 2 | 1 | 1 |
| 2018 | 69 | 2 | 1 | 1 | 2 | 1 | 1 |
| 2017 | 232 | 2 | 1 | 1 | 2 | 1 | 2 |
| 2016 | 142 | 2 | 2 | 0 | 0 | 0 | 0 |
| 2015 | 95 | 2 | 1 | 0 | 0 | 0 | 0 |
| 2014 | 31 | 2 | 1 | 0 | 0 | 0 | 0 |
| 2013 | 114 | 2 | 2 | 0 | 0 | 0 | 1 |
| 2012 | 20 | 2 | 1 | 0 | 0 | 0 | 0 |
| 2011 | 82 | 2 | 1 | 0 | 0 | 0 | 0 |
| 2010 | 43 | 2 | 1 | 0 | 0 | 0 | 0 |
| 2009 | 964 | 2 | 1 | 1 | 2 | 0 | 0 |
| 2008 | 220 | 1 | 1 | 1 | 2 | 0 | 0 |
| 2007 | 224 | 1 | 1 | 1 | 2 | 1 | 1 |

| **Grand Total of Hours (all years and courses)** | **2,869** |
|---|---|



*Requestor IP Address: 73.82.123.65*